CONTINENTAL INSURANCE
COMPANY, Plaintiff,

v.

Judy L. McKAIN, Robert McKain, Nancy
Weidinger and Jefferson Duncan and
Aetna Casualty & Surety Company, De-
fendants,

v.

ALLSTATE INSURANCE COMPANY,
Third–Party Defendant.

Civ. A. No. 92–0296.

United States District Court,
E.D. Pennsylvania.

Feb. 22, 1993.

**892**

Edward J. Cermanski, E. Douglas Sederholm, White and Williams, Philadelphia, PA, for Continental Ins. Co.

Michael J. Panichelli, Litvin, Blumberg, Matusow & Young, Philadelphia, PA, for Judy L. McKain and Robert McKain.

Michael J. McCaney, Jr., Boroff, Harris & Heller, P.C., Steven Kapustin, Plymouth Meeting, PA, for Nancy Weidinger.

Elissa J. Kahn, Goldfein & Joseph, Philadelphia, PA, for Aetna Cas. & Sur. Co.

Jack T. Ribble, Jr., German, Gallagher & Murtagh, Philadelphia, PA, for Allstate Ins. Co.

Michael P. McKenna, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, PA, for Pennsylvania Nat. Ins. Companies, a/k/a Pennsylvania Nat. Mut. Cas. Ins. Co.

## MEMORANDUM AND ORDER

YOHN, District Judge.

This is a declaratory judgment action brought by Continental Insurance Company ("Continental") under Title 28 U.S.C. §§ 2201 and 2202 in a diversity case to determine the scope of three insurance policies and the coverage owed under them to Sergeant Jefferson Duncan II. The policies were issued by Continental, Aetna Casualty and Surety Company ("Aetna") and Allstate Insurance Company ("Allstate"). Sergeant Duncan is a defendant in two personal injury lawsuits in the Court of Common Pleas of Philadelphia County brought by defendants in this case, Judy and Robert McKain and Nancy Weidinger. The underlying suits arose out of an automobile accident that occurred on February 27, 1989. All of the parties to this suit and the underlying suits except Jefferson Duncan have filed motions for summary judgment on the respective obligations of the insurance companies. The obligations and respective coverages of each of the insurance companies will be discussed in turn.

## I. BACKGROUND

On February 27, 1989, an automobile driven by Sgt. Duncan collided with one driven by Judy McKain. Mrs. McKain suffered extensive injuries that may leave her permanently disabled. Nancy Weidinger, who was a passenger in Mrs. McKain's car, also suffered injuries. At the time of the accident, Sergeant Duncan was driving a rental automobile. It was owned by General Motors Acceptance Corporation ("GMAC") and leased to McCafferty Ford Sales, Inc. ("McCafferty") under the GMAC rental plan lease agreement. A copy of the Master Lease Agreement appears as Aetna Exhibit F ("Master Lease"). Under this agreement, McCafferty rented General Motors vehicles to customers.

On the day of the accident, Sgt. Duncan was driven by a friend to Reedman Corporation ("Reedman"). Approximately one week earlier, Duncan had brought his car, a 1988 Mercury Sable which he had bought at Reedman, back to the company for repairs. Reedman had notified Duncan that the repairs were completed, and he came to pick up his car. After his friend had left Reedman, Duncan drove his Sable off the lot and discovered that the problem with the automobile's transmission had not been corrected. He returned the car to Reedman's service

department, which determined that further work was needed.

Although Duncan's Sable was not covered by a warranty which obligated Reedman to arrange for a "loaner" vehicle when the customer's car was in the shop, Duncan argued that he should have one because of the repeated repairs that had been necessary on his car. Reedman agreed to accommodate him. Duncan Deposition, Aetna Exhibit E, ("Duncan Dep.") at 48, 52.

As it did under its usual arrangement for dealing with warranty customers, Reedman notified the rental agency, in this case McCafferty, that it would pay the base rental charge. Cook Deposition, Aetna Exhibit G, ("Cook Dep.") at 32–47. Sgt. Duncan was then taken by a Reedman employee to McCafferty, where he signed a rental agreement, was given virtually unlimited free milage pursuant to the agreement between Reedman and McCafferty, and was given the option of purchasing collision damage insurance and personal injury insurance for himself. Duncan Dep. at 53–54, 92; Ratcliffe Deposition, Aetna Exhibit I, ("Ratcliffe Dep.") at 11; Duncan Dep. at 61–66; Richardson Deposition, Aetna Exhibit J, ("Richardson Dep.") at 24–27. The rental agreement stated that the renter carried his own liability insurance.[1] Rental Agreement. Sgt. Duncan opted for the collision damage insurance only, with $500 deductible, which he paid when the car was severely damaged in the accident. Richardson Dep. at 24–27.

Before being given the rental car, Sgt. Duncan was asked his address, telephone number and birth date, and he showed the McCafferty representative his Alabama driver's license. Duncan Dep. at 89, 104–105. He was asked whether anyone else would drive the car and replied that no one else would. Duncan Dep. at 108–109. He stated in his deposition that he had "skimmed" the rental agreement before signing it and that it was explained to him while he looked at it. Duncan Dep. at 96, 98–100, 131. Because he was a Reedman customer, the usual McCafferty requirements of a Pennsylvania driver's license and a credit check were waived. Ratcliffe Dep. at 19, 50. Duncan drove the car off the lot and soon thereafter was involved in the automobile accident with Judy McKain and Nancy Weidinger.

At all relevant times, Reedman was insured under a policy issued by Aetna. The Aetna policy appears as Aetna Exhibit C ("Aetna policy"). Sgt. Duncan's own car, the 1988 Mercury Sable which was at Reedman for repairs at the time of the accident, was a listed vehicle on an insurance policy issued by Allstate to Jefferson Duncan, Sr., father of Sgt. Jefferson Duncan, II. Sgt. Duncan testified at deposition that, at the time of the accident, the Sable was titled in the name of Mr. Jefferson, Sr., through what Sgt. Duncan claims was a clerical error. Duncan Dep. at 20–21. The Allstate policy appears as Aetna Exhibit D ("Allstate policy"). GMAC was the insured on a policy issued by Continental. The policy covered General Motors Corporation ("GM") and GM dealers participating in the GMAC rental plan, including McCafferty. The Continental policy appears as Aetna Exhibit B ("Continental policy").

At the time of the accident, Sgt. Duncan was on active military duty and had been stationed in the Philadelphia area since 1986. He lived off base, in a property on Woodstock Street which he had rented unfurnished and furnished himself. Prior to living at that address, Sgt. Duncan had leased and lived in two other rental properties in Philadelphia. Stipulation of Uncontested Facts ("Stipulation") at ¶¶ 31–32. He gave his permanent residence as Montgomery, Alabama. Duncan Dep. at 17–18. Sgt. Duncan was registered to vote in Alabama, paid Alabama state taxes, had a bank account in Alabama, registered his Mercury Sable there, held an Alabama driver's license, had lived at his parents' home until the time he had entered the military nearly nine years before date of the accident, and still kept some possessions

1. Both Sgt. Duncan and the rental agent testified that they thought optional insurance was offered to renters that covered third party liability claims. Sgt. Duncan thought that he had chosen to take such insurance. Duncan Dep. at 62; Richardson Dep. at 24. In fact, no such insurance was offered. The rental agreement stated that the renter provided his own liability insurance. Rental Agreement, Aetna Exhibit H.

there. Duncan Dep. at 10–16, 112–16, 124–27.

## II. DISCUSSION

### 1. *Summary Judgment Standard*

■ Summary judgment may be granted under Rule 56 of the Federal Rules of Civil Procedure "if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. After the moving party presents the basis for its motion, the non-moving party, if it claims that the case is not ripe for summary judgment, must show the existence of genuine disputes between the parties as to material facts, disputes that might affect the outcome of the suit under the prevailing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In this case, none of the parties disputes that the case is ripe for summary judgment; none maintains that there are in dispute any genuine issues of material fact that preclude summary judgment. All of the parties agree that the disputes concern only questions of law and of contract interpretation that are within the province of the court.

### 2. *The Allstate Policy*

Third party defendant, Allstate, was joined in this matter by defendant, Aetna, who alleges that Allstate may be liable to Aetna for contribution or indemnification should Aetna be found liable for payment of damages in the underlying suits. Allstate has filed a motion for summary judgment on the ground that it owes Sgt. Duncan no coverage under the policy.

Allstate issued an Alabama contract of insurance to the named insured, Jefferson Duncan, Sr. The policy, which lists the 1988 Mercury Sable on the declarations page, includes the following as persons insured:

(1) While using your insured auto;
 (a) You,
 (b) Any resident, and
 (c) Any other person using it with your permission.

(2) While using a non-owned auto;
 (a) You,
 (b) Any resident relative using a four wheel private passenger or utility auto.

(3) Any other person or organization liable for the use of an insured auto if the auto is not owned or hired by this person or organization.

*Id.* at 5, "Persons Insured". "You" or "Your" is defined in the policy as meaning "the policyholder named on the declarations page and that policyholder's resident spouse." Aetna policy at 6, Definition 5. Thus only Jefferson Duncan, Sr. and his wife are included within the definition. Sergeant Duncan is not a named policyholder.

If Sgt. Duncan is a resident relative under the policy, then he comes under Persons Insured, section (2)(b), which covers "[a]ny resident relative using a [non-owned] four wheel private passenger or utility auto." "Resident" or "reside" in the policy is defined as:

> the physical presence in your household with the intention to continue living there. Unmarried dependent children, while away from home will be considered residents if they intend to continue to live in your household.

Allstate Policy at 6, Definition 3.

[2] Allstate contends that Sgt. Duncan is not a resident relative and therefore it owes him no coverage. In support of its position, Allstate contends that Sergeant Duncan did not maintain "the physical presence" in the home of his parents with the intention to continue living there at any time relevant to this action, nor was he a dependent child away from home.

Common law meanings of "residence" and "resident" can be confused and murky. The terms "residence" and "domicile" are sometimes used interchangeably and sometimes with quite different meanings. As the Alabama Supreme Court noted in *State Farm Mutual Automobile Insurance Company v. Hanna*, 277 Ala. 32, 37, 166 So.2d 872, 876 (1964), "[t]he word 'residing' is an ambiguous, elastic, or relative term, and includes a very temporary, as well as a permanent abode

[citation omitted]." However, common law meanings do not apply where the term is clearly defined in a way that differs from the common law. *See Boswell v. South Carolina Ins. Co.,* 353 Pa.Super. 108, 509 A.2d 358 (1986). When the terms "resident" and "residence" are specifically defined in the policy, it is not necessary or appropriate to look to the common law meaning, in the same way that one does not resort to a common law definition of "residence" in a statute when the statute clearly shows that the legislature did not intend to make its definition synonymous with common law terminology. 353 Pa.Super. at 117–18, 509 A.2d at 363.

Applying the definition of "resident" in the Allstate policy, there is no question that Sgt. Duncan was not dependent on his parents for support (Stipulations, ¶ 44), and therefore did not qualify as a resident relative under the second sentence in the definition of "resident," which includes "dependent children away from home who intend to continue to live in your household." In addition, that sentence suggests that non-dependent children living away from home are excluded from the definition. Sgt. Duncan had been away from his parents' home, except for brief vacations or visits, since he had joined the military. *Id.* at ¶¶ 39–43. And while he planned to return to Montgomery when he retired from the military in nine years, he thought that he would probably set up his own household rather than return to his mother's home. *Id.* at ¶ 47.

Sgt. Duncan also fails to qualify as a resident relative under the first sentence of the policy definition. Under that sentence, "residence" requires "the physical presence" of the relative in "your" household. The court finds "the physical presence" to mean, unambiguously, "bodily presence." Sgt. Duncan kept some possessions at his parents' home, but he clearly lived in Philadelphia, in an apartment he had furnished. Whereas "*a* physical presence" might refer to the presence of possessions, "*the* physical presence ... with the intention to *continue living* there" must mean that the person himself actually lives there.

■ None of the parties could find a case in which "physical presence" was defined, but the usage of the term in Pennsylvania case law suggests that it means bodily presence and not merely the presence of possessions. In *Amica Mutual Ins. Co. v. Donegal Mutual Ins. Co.,* 376 Pa.Super. 109, 115, 545 A.2d 343, 346 (1988), the court quoted a prior opinion in which it had said, "Residence being a factual place of abode. Living in a particular place, requiring only physical presence." *Krager v. Foremost Insurance Co.,* 304 Pa.Super 390, 450 A.2d 736 (1982). Using this standard, the court in *Amica* found that an eighteen-year old child of parents who were separated resided with her mother and not with her father under the following circumstances:

> The trial court found that Elizabeth made "sporadic" visits to her father's house, and that "she did not spend a substantial amount of time at her father's house." During that time, Elizabeth had a closet or two full of clothes at her father's house, approximately forty pairs of shoes, books, cosmetics, stuffed animals and a pet rabbit. She received mail there as well.

376 Pa.Super at 113–14, 545 A.2d at 345. The court upheld the trial court's finding that "the personal items that Elizabeth kept at her father's house at the time she lived with her mother were for convenience and did not evidence that she physically lived there." 376 Pa.Super. at 116, 545 A.2d at 346.

■ Allstate acknowledges, and Aetna asserts, that under both Pennsylvania and Alabama law, there exists a presumption that a person who is a full-time member of the military service retains permanent residence or domicile in the state from which he is inducted until a new residence is established or the initial residence is abandoned. *Nora v. Nora,* 494 So.2d 16 (Ala.1986); *Donegal Mut. Ins. Co. v. McConnell,* 562 So.2d 201 (Ala.1990); *Turek v. Lane,* 317 F.Supp. 349 (E.D.Pa.1970); *Zinn v. Zinn,* 327 Pa.Super. 128, 475 A.2d 132 (1984). However, common law presumptions as well as common law meanings fail to apply where the term is clearly defined to the contrary, as it is here.

While for some purposes, Sgt. Duncan may have been a resident of his parents' household, under the definition in Allstate's policy,

Sgt. Duncan was not a resident relative in his parents' household at the time of the accident for purposes of coverage. Sgt. Duncan had retained virtually all the usual indicia of residence in Alabama and at his parents' home. Alabama was the state of his driver's license, voter registration, payment of state taxes, mailing address, and he kept personal possessions at his parents' home. He had established no new permanent or indefinite residence apart from his parents' home in Alabama, and planned to return to Alabama upon retirement from the military, although he thought that he would "probably" establish his own dwelling rather than live with his mother.[2] Duncan Dep. at 10–17, 112–16, 124–27. But none of these facts is relevant to the status of "resident relative" as defined in Allstate's policy. He was not actually living in his parents' house, nor was he a dependent child temporarily away from home. Therefore, he does not qualify under the policy's definition.

The McKains, in their trial memorandum, contend that there is a basis for Sgt. Duncan's coverage under the Allstate policy even if he is not a resident relative. Above, we quoted three classes of "Persons Insured" under the policy. We have found that Sgt. Duncan does not qualify under section (2)(b) as a resident relative. The McKains contend that he qualifies under section (1)(c) as any person using "your insured auto" with "your permission".

The court will assume that Sgt. Duncan was using the hired auto with the implied permission of his father, who was the policyholder and therefore qualifies as "your" for purposes of "your permission." Although his father was probably not aware that his son was using a hired automobile while the Mercury Sable listed on the policy was being repaired, we can conclude that he would have consented had he known, given that he had consistently helped to facilitate his son's acquisition and care of the Mercury Sable.[3]

■ The question is whether the hired car is "your insured auto" under the terms of the policy, in which case anyone who is driving the auto with "your" permission is covered, or just *an* insured (non-owned) auto, in which case it would have to be driven by Mr. or Mrs. Duncan or a resident relative to qualify for coverage. There are five categories of "insured autos." They may be summarized as follows: (1) any auto listed on the declarations page and its replacement, if Allstate is timely notified; (2) an additional acquired auto, if Allstate is timely notified; (3) a substitute non-owned auto used temporarily while yours is unavailable; (4) a non-owned auto used with the permission of the owner, but not for the regular use of you or a resident; and (5) a trailer while attached to an insured auto, with certain exceptions. Allstate policy at 21.

The McKains seek to include all five categories of "insured autos" under the policy in the category of "your insured auto," which would mean that anyone using one with the permission of Mr. or Mrs. Duncan would be covered. The category of "insured auto" that fits the present case is (3). It includes:

> A substitute four wheel private passenger auto or utility auto, not owned by you or a resident, temporarily used with the permission of the owner while your insured auto is being serviced or repaired, or if your insured auto is stolen or destroyed.

Allstate policy at 21. Under this section, the hired auto Sgt. Duncan was driving at the time of the accident is clearly an "insured auto." Is it also "your insured auto"? The McKains say that it is.

■ The court finds no support for the McKain's position in the policy. First, the

---

**2.** The home now belongs to Sgt. Duncan's mother's following the death of his father. At his deposition, Mr. Duncan expressed his intention of returning to Montgomery upon retiring after 20 years service in the military. When asked whether he would establish his own residence there, he answered that he probably would. Duncan Dep. at 124–25. We do not take his answer to mean, as Allstate did in its pre-trial memorandum, that "upon retirement from the

military he expressly did not intend to return to his parents' home in Montgomery, Alabama at that time."

**3.** Sgt. Duncan's father had helped him make initial payments on the automobile, as well as listing it on his policy and keeping it for him at times while he was away on duty. Duncan Dep. at 37–42.

language of section (3) itself leads to the opposite conclusion. In section (3), a substitute auto is covered "[w]hile your insured auto is being serviced or repaired." Under the policy, the hired auto is "a substitute" for "your insured auto"; it is not itself "your insured auto". Something cannot be a substitute for itself. Second, if "your insured auto" were the same as any insured auto, there would be no reason to have separate categories of "persons insured," one for persons using "your insured auto" and one for a non-owned auto. The latter category of insured persons would suffice. The section describing who is covered while using "your insured auto" would be mere surplusage. When there are alternative readings of a clause in a contract, the rule of construction is that the one that avoids surplusage should be chosen. *Sparler v. Firemen's Ins. Co.*, 360 Pa.Super 597, 607, 521 A.2d 433, 438 (1987). *See also General Mills, Inc. v. Snavely*, 203 Pa.Super. 162, 168, 199 A.2d 540, 544 (1964).

The court therefore concludes that the hired automobile is not "your insured auto" so as to provide coverage under the policy for anyone driving it with the permission of the policyholder or his wife. This interpretation is supported by a limitation in the policy for the third class of "persons insured" quoted above. In addition to the persons insured for "your insured auto" and "a non-owned auto" quoted above, the policy provides coverage for:

(3) Any other person or organization liable for the use of an insured auto if the auto is not owned or hired by this person or organization.

Allstate policy at 5. We have already noted that the hired car was an "insured auto" under the Allstate policy because it was a substitute for an Mercury Sable listed on the declarations page while the Sable was being repaired. Furthermore, the rental contract indicated that Sgt. Duncan was liable for the use of the car. However, Sgt. Duncan is not covered under section (3) because, as discussed below, he was a hirer of the automobile.

The court finds that Sgt. Duncan is not a "person insured" under any of the categories in the Allstate policy. Therefore, Allstate owes him no coverage under the policy, and the court will grant Allstate's motion for summary judgment.

3. *The Aetna Policy*

Aetna has filed a motion for summary judgment asking the court to declare, *inter alia*, that its policy with Reedman does not cover Duncan for any liability arising out of the accident, either because Duncan does not come within the definition of an "insured" or because he comes within a specific exclusion in the policy.

Aetna's initial argument is that Duncan does not qualify as an "insured" under the policy. A "covered automobile" under the policy is "any 'auto'" (Aetna policy at 1), and the following are listed as "insured" for covered autos:

(1) You for any covered "auto."

(2) Anyone else while using with your permission a covered "auto" you own, *hire* or borrow ...

Aetna policy at 11 (emphasis added). The "you" and "your" of this provision refer to Reedman Corporation. *Id.* at 1. Aetna contends that Reedman did not own, hire or borrow the automobile Duncan was driving at the time of the accident and that, therefore, Reedman did not have the authority to give permission for its use.

In support of its contention that Reedman could not give Duncan permission to drive the rental car, Aetna relies on two cases, *Semple v. State Farm Mut. Auto. Ins. Co.*, 215 F.Supp. 645 (E.D.Pa.1963) and *Braun v. Annesley*, 936 F.2d 1105 (10th Cir.1991). In both cases, the question was whether the buyer was a permissive user of a vehicle and therefore covered under the seller's insurance policy once the title had changed hands. In both cases the court decided that he was not. Once the seller no longer had title, he could not give permission to use the vehicle. Neither case fits the situation at hand, that of an automobile agency that was instrumental in securing a hired car for a customer. Aetna's argument that Reedman was unable to give permission rests on its contention that Reedman neither owned, hired nor borrowed the automobile that Sgt. Duncan used.

Clearly, Reedman neither owned nor borrowed the automobile from McCafferty for Sgt. Duncan. The issue is whether it participated sufficiently in the hiring to bring Duncan within the Aetna policy.

The relevant background facts are as follows: Reedman was performing repair work on Sgt. Duncan's automobile at the time of the accident. Although Duncan did not have a warranty that provided for a "loaner" car during repairs, Reedman agreed to arrange for one in his case because of the need for repeated repairs on Duncan's car. Duncan Dep. at 48, 52. Reedman had a longstanding unwritten agreement with McCafferty with regard to such "loaner" cars for its customers. Cook Dep. at 32–47. Reedman called to let McCafferty know that it was sending Duncan over for a car and that it would pay for the car, a standard procedure. Richardson Dep. at 16, 30–31. The Reedman contact person and the purchase order number from Reedman were noted on the rental contract for the car. *Id.* at 29–32. Under the arrangement between Reedman and McCafferty, Duncan, unlike other rental customers who came in off the street, would pay no daily rental charge, would have virtually unlimited free milage, would undergo no credit card check, and would have his out-of-state driver's license accepted. *Id.* at 34–35, 70; Ratcliffe Dep. at 50. As a McCafferty representative explained, the last two requirements were waived for Reedman customers because, in case the customer did not return the rental car, McCafferty would tell Reedman to hold his car as security until he had settled with McCafferty. Ratcliffe Dep. at 50–51. Like other rental customers, Sgt. Duncan was asked for his address, telephone number, proof of age, and valid driver's license and was given the option of purchasing collision damage insurance and personal injury insurance. Duncan testified at deposition that he did not know until he got to McCafferty that he would be signing a rental car agreement. Nevertheless, he did sign it, purchased optional collision insurance, and stated that he had "skimmed" the agreement while it was being explained to him. Duncan Dep. at 89, 96, 98–100, 104–105, 131.

Aetna claims that Reedman's role in facilitating the rental does not transform Reedman into the renter or hirer of the car. Aetna contends that although Reedman called McCafferty to arrange for the rental and agreed to pay the base rental charge, "[t]hese acts should be viewed as a courtesy akin to calling a cab for a customer and/or paying for cab fare." Aetna's Memorandum in Support of its Motion for Summary Judgment (hereinafter "Aetna's Memo") at 11. The court finds that the analogy does not serve to absolve Reedman of control or responsibility for hiring the vehicle from McCafferty in this transaction. The arrangement between Reedman and McCafferty was far more extensive than that between a business and a cab it calls for a customer on a one-time basis. Indeed, if the business had a long-standing agreement to call and pay for cabs for its customers, we might well conclude that it was the business and not the individual customers who hired the cabs.

Aetna also cites as proof that Duncan was the renter paragraph 15 in the rental agreement that Duncan signed, which contains the following language:

> If the *customer has directed the billing charges,* in connection with this agreement, to be transmitted to another person, firm or organization which upon being so billed has failed to make payment, *then the customer shall upon being billed, properly pay* said charges.

Aetna Memo at 10, citing Rental Agreement, ¶ 15 (emphases added). Aetna contends that, under the language of this paragraph, Duncan could be liable to McCafferty for the base rental fee if not paid by Reedman. This makes no sense at all. It was not Duncan who, as customer, directed that the billing charges be transmitted to Reedman; it was Reedman who agreed to pay the bill under its long-standing arrangement with McCafferty. It was a Reedman representative who directed McCafferty to bill Reedman when he gave a purchase order number to McCafferty for the billing. Therefore, this paragraph cannot make Duncan liable for the charges should Reedman fail to pay them.

The case law that Aetna cites also fails to support the point that Duncan, and not

Reedman, is the renter. In *Ryan v. Furey,* 437 Pa. 96, 262 A.2d 305 (1970), the signer of a rental agreement used a companion's credit card to pay for the charges. After the signer was involved in an accident, the insurance company declined coverage on the ground that the signer of the rental agreement was not authorized to use the credit card. The *Ryan* court found that the signer was the true renter and was liable for the charges, under a paragraph with language similar to that quoted above by Aetna. It concluded that the companion whose credit card was used had nothing to do with the rental transaction. Aetna takes this case to mean that the entity who pays for a rental does not thereby become the "renter" or "hirer" of the car. That bare scenario does not, however, fit the facts of this case. Reedman was not charged for the rental without its knowledge or consent; it arranged for the rental and directed that it be billed for the daily rental charges, under its long-standing agreement with McCafferty. The holding in *Ryan* therefore does not help Aetna in this case.

In several cases cited by Aetna, courts have interpreted the term "hired vehicle" as defined in insurance contracts to require either that there be a separate contract under which the vehicle is leased to the named insured or that the named insured have exclusive use or control over the vehicle, or both. *See Sprow v. Hartford Ins. Co.,* 594 F.2d 418 (5th Cir.1979); *Transport Indem. Co. v. Liberty Mut. Ins. Co.,* 620 F.2d 1368 (9th Cir.1980); *Wolverine Ins. Co. v. State Auto. Mut. Ins. Co.,* 415 F.2d 1182 (6th Cir. 1969). Aetna contends that Duncan, not Reedman, had the contract with McCafferty and that Duncan, not Reedman, had exclusive use and control of the rented car.

■ In the case at bar, there was no definition of a hired vehicle in Aetna's policy with Reedman, which opens the door to some ambiguity. Where a term in an insurance policy is ambiguous, it is to be construed strictly against the insurer. *Pacific Indem. Co. v. Linn,* 766 F.2d 754, 761 (3d Cir.1985), *citing Mohn v. American Casualty Co.,* 458 Pa. 576, 586, 326 A.2d 346, 351 (1974). But even if we were to use the meaning of "hired vehicle" in the cases cited by Aetna, we could not conclude that the sole renter of the vehicle involved in the accident was Sgt. Duncan. Rather, Reedman and Sgt. Duncan both participated significantly in the rental of the vehicle under the criteria used in those cases. At oral argument, the attorneys for the parties conceded that the renter did not have to be *either* Reedman *or* Duncan, that the status of co-renter was legally possible, and that it would result in coverage.

■ The court finds that Reedman did more than just facilitate rentals by its customers from McCafferty. Reedman had an agreement with McCafferty with respect to the hire of automobiles for its customers. It negotiated a special low daily rental rate, which it paid, and it controlled which customers were authorized for such "loaner" cars. On the other hand, Duncan had control over the purchase of optional insurance and over the operation of the vehicle. The court concludes that neither Reedman nor Duncan had exclusive control of the vehicle, but that both exercised some control over it. Both Reedman and Duncan also had agreements with McCafferty with respect to the rental. The fact that Reedman's agreement appears to have been unwritten does not alter this fact. Cook Dep. at 14. McCafferty accepted authorizations from Reedman to provide cars to Reedman customers on special terms; McCafferty billed Reedman monthly for any outstanding daily rental charges for these vehicles. Ratcliffe Dep. at 10–15, 18–23. The fact that Duncan signed a rental agreement with McCafferty is not dispositive of who is the renter for purposes of insurance. *See Western Casualty & Surety Co. v. National Union Fire Ins. Co.,* 677 F.2d 789 (10th Cir.1982). Both Reedman and Duncan participated in important aspects of the rental, and the rental would not have occurred as it did without the active participation of both and the presence of the agreements which each had with McCafferty.

The court therefore holds that Reedman and Duncan co-hired from McCafferty the vehicle that Duncan was driving when the accident occurred, that Duncan was using the vehicle with Reedman's permission, which was necessary for Duncan to obtain the vehicle in the way that he did and without pay-

ment, and that, therefore, Duncan falls within the definition of an "insured" in Aetna's policy.

■ Having determined that Duncan falls within the definition of "insured," we must now decide whether Aetna's policy specifically excludes coverage for Duncan in the underlying cases. Aetna claims that the following exclusion in the policy precludes coverage of Duncan:

> This insurance does not apply to any of the following:
>
> * * * * * *
>
> 7. LEASED AUTOS [EXCLUSION]
>
> Any covered "auto" while leased or rented to others. But this exclusion does not apply to a covered "auto" you rent to one of your customers while their "auto" is left with you for service or repair.

Aetna policy at 12–13. Under the Aetna policy, a covered auto is defined as "any auto" for purposes of liability coverage. Aetna policy at 1–2. The court has concluded Duncan is an insured because Reedman was a co-lessee. Therefore, the auto was not one that was leased or rented *by* Reedman (or by anyone else) *to "others"*, but rather was one leased *by* McCafferty *to* Reedman and Duncan. Because Reedman was a co-lessee of the vehicle and not a lessor, and because the vehicle was rented to a named insured and not to "others", the exclusion clearly does not apply.[4]

The parties agreed at oral argument that the material facts were undisputed and that the foregoing issues could be decided as a matter of law. Aetna's motion for summary judgment will be denied and Aetna will be liable for coverage if Duncan is found liable in the underlying suits. The question of the relationship between the remaining insurers will be discussed below.

#### 4. *The Continental Policy*

At oral argument, all of the parties agreed that if the language of Continental's insurance policy is found by the court to be clear and unambiguous, there are no remaining

issues of material fact in dispute and the court should decide whether there is coverage as a matter of law. They also agreed that if the language is found to be ambiguous, a trial will be held to determine the intent of the parties to the contract.

Continental claims that Sgt. Duncan is an "insured" under its policy with GMAC for $100,000/300,000 coverage. Aetna and the plaintiffs in the underlying suits dispute the limits of Continental's coverage and whether it is a primary insurer or, as it claims, an "excess" insurer, liable only for amounts in excess of all other insurance coverage for the accident. Continental has filed this motion for summary judgment, asking that the court declare that the limit of its coverage for the accident is $100,000/300,000 rather than $10,-000,000, both amounts being mentioned in its policy as limits under certain circumstances. It also asks for a declaration that Aetna is the primary insurer, that Aetna is obligated to defend Sgt. Duncan in the underlying actions, and that Continental is obliged to provide only excess coverage if and when the insurance coverage provided by Aetna is exhausted.

The language defining Sgt. Duncan's status as an "insured" under the Continental policy is found in "ENDORSEMENT # 5 (WHO IS INSURED AMENDMENT). This endorsement deletes the "Who is insured" provisions of the printed policy and replaces those provisions with the following:

> D. WHO IS INSURED.
>
> 1. "You" are an "insured" for any covered "Auto".
>
> 2. While a covered "Auto" is used in rental business, the following is an "Insured" [and has $10,000,000 coverage]:
>
> a. General Motors Dealers and their subsidiaries participating in the GMAC Dealer Rental Plan [including McCafferty].
>
> b. Anyone else while using with the permission of 2.a. above a covered "Auto".

---

4. Neither does Duncan come under the exception to the leased auto exclusion. In order for that exception to apply, Reedman would have

had to rent a car *to* him. Instead, it participated in renting one *for* him.

3. While a covered "Auto" is used under a written rental agreement stating a rental period of less than one year and in which "you" agree to provide liability insurance, the following is an "Insured" [and has $100,000/300,000 coverage]:

 a. The lessee or rentee.

 b. Any employee or agent of the lessee or rentee.

 c. Any person using an "Auto" with the permission of either 3.a. or 3.b. above.

4. Anyone liable for the conduct of an "Insured" described above is an "Insured" but only to the extent of that liability.

Continental policy, Endorsement # 5. The critical question is whether Duncan is an insured under section D.2. or section D.3. or both. The limits of coverage differ substantially under the two sections, as detailed in ENDORSEMENT # 6 (LIMIT OF LIABILITY). That endorsement states that, regardless of the number of covered automobiles, insureds, claims or vehicles involved in an accident, the limit of liability for all damages resulting from one accident for insureds as defined in D.2. is $10,000,000. The limit for insureds as defined in D.3. is $100,000 for injury to any one person in any one accident, $300,000 for injury to all persons in any one accident, and $50,000 property damage caused by any one accident. Continental argues that Duncan falls under D.3. only, and that its coverage is therefore limited to the lesser coverage.[5] Aetna and the plaintiffs in the underlying suits argue that Duncan falls under D.2. only or under both D.2. and D.3. and that, therefore, Continental's coverage is $10,000,000.

■ It is well settled that the interpretation of contractual provisions is a question for the court. *McDowell–Wellman Engineering Co. v. Hartford Accident & Indemnity Co.*, 711 F.2d 521, 525 (3d Cir.1983); *Johnson v. Bensalem*, 609 F.Supp. 1340 (E.D.Pa.1985). In the first instance, the language of an insurance policy is to be given its plain and ordinary meaning. *Northbrook Ins. Co. v. Kuljian Corp.*, 690 F.2d 368 (3d Cir.1982). If an insurance policy is reasonably susceptible of two interpretations it is to be construed in favor of the insured in order not to defeat, without plain necessity, the claim to indemnity which it was the insured's object to obtain. *Blue Anchor Overall Co. v. Pennsylvania Lumberman's Mut. Ins. Co.*, 385 Pa. 394, 123 A.2d 413 (1956), citing *Armon v. Aetna Casualty and Surety Co.*, 369 Pa. 465, 87 A.2d 302 (1952); *Celley v. Mut. Ben. Health & Accident Assn.*, 229 Pa.Super. 475, 324 A.2d 430 (1974); *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563 (1983). However, the court must refrain from torturing the language of an insurance policy to create an ambiguity where none exists. *Pacific Indemnity Co. v. Linn*, 766 F.2d 754, 761 (3d Cir.1985); *McMillan v. State Mutual Life Assurance Co.*, 922 F.2d 1073 (3d Cir.1990), citing *Houghton v. American Guarantee Life Insurance Co.*, 692 F.2d 289 (3d Cir. 1982). If a genuine ambiguity is found, the court has the option of seeking extrinsic evidence.

> When a term in a policy is ambiguous ... and the intention of the parties cannot be discerned from the face of the policy, the court, in its attempts to arrive at a reasonable construction of the policy that is in accord with the parties' apparent intention, may look to extrinsic evidence of the purposes of the insurance, its subject matter, and the circumstances surrounding the making of the contract.

*Pacific Indemnity*, 766 F.2d at 761, citing *Northbrook Insurance Co. v. Kuljian Corp.*, 690 F.2d at 368, 372 (3d Cir.1982).

■ Defendants McKain and Weidinger argue that Sgt. Duncan is an "insured" under paragraph D.2.b. because, they say, he was using the rental car "with the permission of" McCafferty while it was being "used in rental business." Continental argues that this is a "tortured" interpretation of the policy because it overlooks "the clear distinction set

**5.** Aetna argues that Continental violates Pennsylvania public policy by creating two classes of insureds with different levels of coverage, but it cites no authority in support of this contention.

Aetna's response at 6. The court finds nothing in Pennsylvania law or public policy that requires that all of those covered under an automobile insurance policy be covered in the same amount.

forth in Endorsement #5 between autos 'used in rental business' and autos 'used under a written rental agreement stating a rental period of less than one year and in which [GMAC] agree[s] to provide liability insurance' ". Memorandum of Law of Plaintiff Continental Insurance Company in support of Its Motion for Summary Judgment at 10. Continental takes this difference in wording in sections D.2. and D.3. to mean that the parties to the contract

> intended to create separate categories of insureds with vastly different limits of liability. The clear intent of paragraph D.2. is to cover the auto dealers participating in the GMAC Rental Plan and their employees or others using the autos with the permission of the dealers in the course of the dealers' rental business. For this category of insureds ... GMAC and Continental agreed that the limit of liability would be $10 million for all damages resulting from any one accident.
>
> In contrast to the category of insureds described above, GMAC and Continental clearly intended, through paragraph D.3., to provide a separate and distinct category of insureds, to wit, the rental customers themselves and their employees, agents, and permissive users.

*Id.* It may be that Continental meant to draw such a distinction, and to provide a smaller amount of insurance for individual rental customers; the Master Lease makes that distinction clearly.[6] But Continental failed to use the clear language of the Master Lease in Endorsement #5 of the contract,

and the language it used instead excluded Duncan from coverage under D.3. and not under D.2.

In section D.3. of its policy, Continental specifies that the rental agreement stating a rental period of less than one year must also contain an agreement by which " 'you' agree to provide liability insurance." "You" under the policy is GMAC, who is named on the declarations page at item 1. In the rental agreement Sgt. Duncan signed, neither GMAC nor anyone else other than Sgt. Duncan "agreed" to provide liability insurance.[7] Therefore, Sgt. Duncan is not covered under this section of the Continental policy.

On the other hand, there is nothing in paragraph D.2. on its face that excludes Duncan from coverage under that section. Counsel for Continental conceded as much at oral argument. But he contends that the policy must be read as a whole, and claims that when it is read as a whole, the intent to cover rental customers under section D.3. rather than section D.2. becomes clear. He claims that, if D.3. were not taken to separate rental customers from dealers, the section would be mere surplusage, and a construction of a policy provision that leads to surplusage should be avoided. However, the court has found that D.3. does not apply to rental customers such as Sgt. Duncan, in whose rental contracts GMAC failed to agree to provide liability insurance; therefore, the section is not surplusage. Rather, it singles out for reduced coverage rental customers in whose rental agreements GMAC agrees to

---

**6.** The Master Lease states that GMAC agrees to lease to "McCafferty Ford Sales, Inc. ('Lessee')" certain vehicles. It thereby differentiates "lessee" McCafferty, who has $10,000,000 coverage, from "rental customers," who have less coverage. The language is as follows:

> 4. INSURANCE: GMAC shall arrange for bodily injury, property damage and physical damage insurance coverages on all Vehicles.
> (a) The National Surety Corporation [superseded by Continental] ... will provide protection *to GMAC and Lessee* for $10 million single limit Bodily Injury and Property Damage. Limits of liability afforded *to rental customers* for injury to or death of third parties will be $100,000 for any one person and $300,000 per occurrence. A limit of $50,000 will apply with respect to property damage.

Master Lease, Aetna Exhibit F at § 4 (emphases added).

**7.** The rental contract contains the following paragraph:

> 7. The Customer agrees that he will, at his sole risk and expense, maintain Bodily Injury and Property Damage insurance covering the use of the Automobile during the time it is in his possession or used with his permission, and at his direction, until it is returned to the Owner with limits at least equal to or greater than the statutory requirements of the state in which the Automobile is rented.

Rental Agreement at 2. In the Master Lease between GMAC and McCafferty, GMAC had the right to approve the form of the rental agreements between McCafferty and its rental customers. Master Lease at § 1.

provide liability coverage. Since Duncan does not qualify for coverage under D.3., and there is nothing to exclude him from coverage under D.2., the court finds that in the plain language of the policy, he is covered under section D.2. for $10,000,000. Continental claims that to find coverage under section D.2. for Sgt. Duncan requires a "tortured" reading of the section. The court finds that, to the contrary, the language must be tortured to find an ambiguity or a lack of coverage under D.2., the only section of the policy that applies to Sgt. Duncan. One may not torture the language of the policy to create ambiguities or to deny coverage. *Pacific Indemnity,* 766 F.2d at 761.

At oral argument, counsel for Continental stated that if Duncan was excluded from coverage under D.3., then the Continental policy did not provide any coverage for him at all. We cannot agree. Counsel conceded that the language of D.2. did not, on its face, exclude coverage for Sgt. Duncan, and we cannot see any reason that, reading the policy as a whole, there should be no coverage for him. We find only one reasonable interpretation of the plain language of the policy and it covers Sgt. Duncan for $10,000,000. It may not be the interpretation that Continental intended, but the language that was chosen determines coverage. If this sort of coverage were not intended, the drafters could have made that clear by adding a few words. It is not the function of the court to rewrite the policy for the parties. Both Continental and GMAC are substantial and experienced businesses capable of negotiating contracts of insurance to their satisfaction. We must therefore assume that the parties knew what they were doing and that their contract means what it says.

### 5. *The Relationship Among The Insurers*

The question remaining is the relationship between Continental and Aetna, the two insurer who this court has found owe coverage to Sgt. Duncan for the accident. The court must determine whether one is the primary insurer of Sgt. Duncan and the other the excess insurer, or whether they have concurrent responsibility. In addition, the court must determine whether either or both insurers have a duty to defend Sgt. Duncan in the underlying actions.

■ **a.** *Duty to Defend.* Where the insurance policy states a duty to defend the insured, then whenever the complaint filed by the injured party may *potentially* come within the policy's coverage, the insurance company is obliged to defend an insured. *Pacific Indem. Co. v. Linn,* 766 F.2d 754 (3d Cir.1985); *King Aluminum Corp. v. William Hyndman III Ins. Agency, Inc.,* 370 F.Supp. 621 (E.D.Pa.1974); *Widener University v. Fred S. James & Co.,* 371 Pa.Super. 79, 537 A.2d 829 (1988); *Gedeon v. State Farm Mut. Auto. Ins. Co.,* 410 Pa. 55, 188 A.2d 320 (1963). "The duty to defend remains with the insurer until the insurer can confine the claim to a recovery that is not within the scope of the policy." *Pacific Indemnity,* 766 F.2d at 760, *citing Cadwallader v. New Amsterdam Casualty Co.,* 396 Pa. 582, 152 A.2d 484 (1959). However, there is no duty to defend where the policy does not state one. *Widener University,* 537 A.2d at 832, *citing King Aluminum Corp.*

Both of the policies at issue in this case state a duty to defend, and because the claim is potentially, and this court has found is in fact, within the terms of both policies, both insurers have a duty to defend. *See* Continental policy at 2; Aetna policy at 11. Therefore, both Aetna and Continental have the duty to defend Sgt. Duncan in the underlying suits.

■ **b.** *"Other Insurance" Clauses.* "Other insurance" clauses limit the extent to which an insurer is liable where there is another policy (or policies) applicable to the claimed loss. *Pacific Indemnity,* 766 F.2d at 767. Both Aetna's and Continental's policies have "other insurance" clauses in them saying that the insurance provided under the policy is not available until "other insurance" has been exhausted. Under Pennsylvania law, " 'other ... insurance exists only where there are two or more insurance policies covering the same interest, the same subject matter and [insuring] against the same risk.' " *Id., quoting Blue Anchor Overall,* 385 Pa. at 400, 123 A.2d at 415; *see also Sloat v. Royal Insurance Co.,* 49 Pa. 14 (1865). If the Continental and Aetna policies

indeed provide "other insurance" to each other it means that they provide, in effect, double insurance for this occurrence, and the question of priority or apportionment arises. *Clarke v. Western Assur. Co.*, 146 Pa. 561, 23 A. 248 (1892); *Meigs v. Insurance Co. of North America*, 205 Pa. 378, 54 A. 1053 (1903).

By the terms of its policy, Continental declares that it is an excess insurer in this accident, and that it will contribute only after the limits of all other insurance policies have been exhausted. Endorsement # 7 of Continental's policy with GMAC describes Continental's primary and excess liability. It reads in pertinent part:

1. For any covered "Auto", "You" own this policy provides primary insurance [sic]

. . .

. . . . .

2. If other valid and collectible insurance applicable to any "Accident", "Loss" or expense covered by this policy is available to the "Insured", other than "you", the insurance afforded by this policy shall be excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this policy subject to the terms of other insurance.

Continental policy, Endorsement # 7.

Aetna also has an excess insurance provision in its policy. Section V.B.5 of the Aetna policy reads:

a. For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance.

. . . . .

c. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

Aetna policy at 19.

Each insurance company acknowledges that it is the primary insurer in certain circumstances; for neither insurer do those circumstances obtain in this case. Continental is not the primary insurer because other valid and collectible insurance applies to the accident and is available to an insured (Duncan) other than "you". ("You" is defined in the policy as those listed on the declarations page: GMAC and General Motors Corporation and its subsidiaries). Aetna is not the primary insurer because Reedman did not own the automobile that Sgt. Duncan was driving.

 Aetna contends that Continental's excess clause is really an "escape" clause, and as such it is unenforceable as against public policy. Response of Defendant Aetna Casualty and Surety Company to Motion for Summary Judgment of Plaintiff Continental Insurance Company ("Aetna's Response") at 5. An "escape" clause in an automobile insurance policy is one that excludes insurance coverage entirely when other insurance is available or limits it to an amount necessary to meet the minimum statutory limits when combined with the other insurance. *See Fryer v. Allstate Insurance Co.*, 392 Pa.Super. 418, 573 A.2d 225 (1990); *Automobile Underwriters, Inc. v. Fireman's Fund Insurance Companies*, 874 F.2d 188 (3d Cir. 1989). Aetna contends that the practical effect of making Continental's coverage excess to its coverage would be to negate entirely any obligation Continental has to Jefferson Duncan. Aetna's Response at 6, n. 3.

The court finds this argument unpersuasive. In the first place, there is no statement or implication in the Continental policy that it is not payable or is limited to make up the legal minimum in the event of other insurance. The purpose and intent of Continental's excess clause is that the policy shall apply and be payable as excess to all other insurance for insureds not designated on the declarations page, up to the face value of the policy, not to the statutory minimum. The fact that, in a particular case, the clause could result in Continental's not having to

pay under the policy does not make it an "escape" clause, and the court finds that it is not an escape clause. *See Liberty Mut. Ins. Co. v. Pacific Indem. Co.,* 579 F.Supp. 140 (W.D.Pa.1984).

Continental cites case law holding that where two policies are concurrently effective and one contains an "excess" clause and the other a "pro rata" clause, the "excess" clause will be given full effect and the "pro-rata" clause will be disregarded. *Pacific Indemnity,* 766 F.2d at 768, *citing Walter v. Dunlap,* 368 F.2d 118 (3d Cir.1966). But in the present case, *both* policies contain excess clauses. Continental looks only at clause (c) in Aetna's policy, which provides for pro-rata payment in case of concurrent coverage, including concurrent excess coverage, and ignores clause (a), relating to excess insurance. In the primary case cited by Continental, *Pacific Indemnity,* there was one primary insurer who agreed to pay pro-rata and one excess insurer, and the primary insurer had to pay to the full extent of its policy because there was no other company insuring on the same basis.

In *Walters v. Dunlap,*[8] 250 F.Supp. 76 (D.C.Pa.), *aff'd* 368 F.2d 118 (3rd Cir.1966) a case cited in *Pacific Indemnity,* the same circumstances prevailed. In *Walters,* there initially appeared to be two excess insurers, as in our case; however, on closer inspection, there turned out to be only one. The court applied the rule stated above, that the pro-rata clause drops out and the excess clause is given full effect, only after it determined that the excess clause in one of the insurance policies did not apply under the circumstances of the case. 250 F.Supp. at 81.

There is another case in which two insurance companies are both, in fact, excess insurers, and it provides more guidance for us than *Pacific Indemnity* or *Walters.* In *Liberty Mut. Ins. Co. v. Pacific Indemnity Co.,* 579 F.Supp. 140 (W.D.Pa.1984), two insurance policies both provided excess insurance. One policy, issued by American Home, incorporated by reference the following excess provision from another policy:

If there be any other insurance against a claim or loss covered by this policy, the insurance under this policy shall be deemed excess insurance over and above and not contributing with such other insurance ...

579 F.Supp. at 142. The other policy, an umbrella policy issued by Liberty Mutual, also contained an excess clause. The policy stated that it would pay all sums in excess of the "retained limit," and the retained limit included *all amounts payable under other insurance. Id.* The court concluded that it was presented with competing excess clauses, and stated that, "[w]here such clauses conflict, neither is given effect and the two insurers stand on equal ground." *Id.*

Continental says that it is an excess insurer for insureds not indicated on the declarations page and will pay only the excess over other all applicable insurance, and Aetna says that it is an excess insurer for non-owned cars and that it will not pay more than its pro-rated share of the excess. Continental further says that when an insurance policy contains a "pro-rata" clause and provides concurrent coverage with an insurance policy containing an "excess" clause, Pennsylvania holds that the insurance policy containing the "pro rata" clause is the primary insurer, but it sites no Pennsylvania or any other authority for circumstances in which *both* policies specify excess coverage only. The only authority the court has found on the point are federal cases interpreting Pennsylvania law, and they hold that where two excess clauses are conflicting or mutually repugnant, they cancel each other out, and both insurers stand on equal ground. *Liberty Mut. Ins. Co.,* 579 F.Supp. at 142; *American Home Assur. Co. v. American Employers Ins. Co.,* 384 F.Supp. 3 (E.D.Pa.1974) (conflicting excess clauses are generally held to cancel each other, leaving insurers to pay the loss in proportion to their policy limits of liability). In the absence of Pennsylvania cases on point, the court agrees with this interpretation of Pennsylvania law. In the present case, the exclusive excess clause in

---

8. The case appears as *Walters v. Dunlap* at 250 F.Supp. 76 and as *Walter v. Dunlap* at 368 F.2d 118.

Continental's policy and the pro-rata excess clause in Aetna's policy are mutually repugnant and cancel each other out.

■ A final argument that Aetna makes with regard to "other insurance" is that its coverage of Duncan is not "other insurance" under the terms of Continental's policy because "other insurance" exists "only where two or more insurance policies cover[ ] the same interest, the same subject matter and against the same risk" *United Nat. Ins. Co. v. Philadelphia Gas Works, Etc.*, 221 Pa.Super. 161, 165, 289 A.2d 179, 181–82 (1972); *Blue Anchor Overall Co.*, 385 Pa. 394, 123 A.2d 413 (1956); *Sloat v. Royal Insurance Co.*, 49 Pa. 14 (1865). Where two or more policies are "other insurance" to each other, they are considered as one policy for purposes of indemnification. *Sloat*, 49 Pa. 14. The underlying reason for this rule is to make sure that the insured will not be entitled to recover double insurance with respect to the same insured interest. *See Ins. Co. of N. America v. Alberstadt*, 383 Pa. 556, 119 A.2d 83 (1956).

It is clear that Continental and Aetna insured against the same risk in this case. Under Pennsylvania case law, where two policies have been held to cover different risks, the difference has been readily apparent. In *Blue Anchor Overall Co.*, 385 Pa. at 398, 123 A.2d at 415, the court found that where only one policy insured specifically against the risk of loss due to leakage from fire protective equipment, and two others insured against loss to the same property from fire damage, the first policy insured for a different risk and therefore was not "other insurance." *Id.*

On the other hand, the courts have found the "same risk" under policies that were in other respects, such as scope, quite different. In *Widener Univ. v. Fred. S. James & Co.*, 371 Pa.Super. 79, 537 A.2d 829 (1988), a case in which defamation claims were brought against Widener University, a general claims made liability policy that included the cost of "investigation and defense of legal actions" was found to be "other insurance" to three policies that provided coverage for personal injury claims, including defamation, with defense costs. 371 Pa.Super. at 85, 537 A.2d at

832. The court did not accept the university's claim that the general claims made policy was fundamentally different from the other policies, and held that they both insured against the same risk of costs incurred in defending a defamation claim.

■ The same risk was also found to be at issue in *American Casualty. Co. v. Phico Ins. Co.*, 145 Pa.Commw. 184, 602 A.2d 904 (1992), in which the court found that a professional nurse's liability policy issued to an individual nurse and a policy issued to the hospital that employed her both protected against the risk of her nursing negligence. In the present case, the court finds that both the Aetna and the Continental policies insured against the same risk of negligent operation of the vehicle by a permissive user, Sgt. Duncan.

The insurance companies do not dispute that they covered the same risk, but Aetna contends that there is no identity of subject matter or interest because the Continental policy covered an "owned" vehicle, while the Aetna policy covered a "hired vehicle". The court finds that this difference, if it is relevant to the question of "other insurance", is one of interest and not of subject matter. The subject matter that both policies insure is the automobile that Jefferson Duncan was driving at the time of the accident. *See Alberstadt*, 383 Pa. 556, 119 A.2d 83 (1956); *Meigs v. Ins. Co. of N. America*, 205 Pa. 378, 54 A. 1053 (1903); *Clarke v. Western Assur Co.*, 146 Pa. 561, 23 A. 248 (1892); *West Branch Lumberman's Exchange v. American Cent. Ins. Co.*, 183 Pa. 366, 38 A. 1081 (1898); *Sloat v. Royal Ins. Co.*, 49 Pa. 14 (1865).

Aetna also claims that the two policies do not cover the same interest because the Continental policy provides coverage to an "owned" vehicle and the Aetna policy, if it applies, "provides coverage for 'hired' vehicles." Aetna's Memo at 9. It further claims that the owner of the vehicle has priority in providing coverage.

The case Aetna cited in which the insurance was held not to be "other insurance" was one in which the risk covered by the insurers was different. Whether the interest

was different was not discussed. *See, e.g. Blue Anchor Overall Co.,* 385 Pa. 394, 123 A.2d 413. Aetna has cited no cases discussing what a different interest entails. The cases the court has found provide it with little guidance, as they deal only with fire insurance and most of them deal with the interests of the seller and the buyer. They are concerned primarily with real property, and the factors they consider are not applicable to the present case. *See, e.g., Mut. Benefit Ins. Co. v. Goschenhoppen Mut. Ins. Co.,* 392 Pa.Super. 363, 572 A.2d 1275 (1990); *Dubin Paper Co. v. Ins. Co. of N. America,* 361 Pa. 68, 63 A.2d 85 (1949); *Ins. Co. of N. America v. Alberstadt,* 383 Pa. 556, 119 A.2d 83 (1956); *Swoope v. U.S. Fire Ins. Co.,* 87 Pa.Super. 349 (1926); *Yanko v. Standard Fire Ins. Co.,* 31 Pa.Super. 1 (1906); *St. Paul Fire and Marine Ins. Co. v. Insurance Placement· Facility,* 687 F.Supp. 172 (E.D.Pa.1988).

The main problem in the present case in determining whether the interest insured is the same or different is identifying the interest. The interest at stake for purposes of "other insurance" can be that of the purchaser of the insurance, that of a named insured (who may be other than the purchaser) or that of an unnamed party who is covered under the policy. GMAC and Reedman bought the insurance and are named insureds, but in addition McCafferty is covered under GMAC's policy as a subsidiary of General Motors Corporation and Duncan is covered under both policies as a permissive user.

In the present case, Duncan's interest is the same under both policies: that of being protected from potential liability judgments for his negligence. Reedman's and GMAC's overall interests in the automobile driven by Sgt. Duncan are not at issue; rather, the interests at stake are those presented by the circumstances of this case. They are GMAC's and Reedman's, and possibly McCafferty's, interests in being protected from liability judgments for the negligence of permissive users of automobiles which they own, lease or hire. Where Aetna insures Reedman's owned and non-owned autos on the same basis with regard to the risk at

issue in this case, and provides the same coverage for both, the court finds that it makes no difference whether Reedman owns or hires the automobile; the interest is the same. In this case, the interest is similar to the risk.

Because it finds the interest, the risk and the subject matter to be the same in this case, the court holds that the Aetna policy operates as "other insurance" to the Continental policy. Because of the concurrent excess clauses in both the Continental and Aetna policies, and because there is no other primary insurer, the· court finds that Continental and Aetna are both responsible for liability coverage.

6. *The Plaintiffs in the Underlying Suits*

The McKains and Nancy Weidinger, plaintiffs in the underlying suits, have also filed motions for summary judgment, and Nancy Weidinger has incorporated by reference the McKain's arguments and their responses to the motions for summary judgment by the insurance companies. Because the points they raised have been addressed in the discussion above, their motions will not be discussed separately. here.

## CONCLUSION

The court concludes that Allstate owes no coverage to Sgt. Duncan and that both Aetna and Continental owe him coverage for liability incurred in his automobile accident of February 27, 1989. Continental and Aetna are concurrent insurers and their respective liability limits are $10,000,000 and $1,000,000. Both Continental and Aetna have a contractual duty to defend Sgt. Duncan in the underlying suits arising out of the accident. An appropriate order follows.

## ORDER

AND NOW, this 22nd day of February, 1993, upon consideration of the motions for summary judgment submitted by plaintiff, Continental Insurance Company, and by defendants, Judy L. McKain and Robert McKain, by defendant, Nancy Weidinger, by defendant Aetna Casualty & Surety Company, and by third-party defendant, Allstate

Insurance Company, and the briefs of the parties thereto, it is hereby **ORDERED** that:

1. The motion of plaintiff, Continental Insurance Company shall be and hereby is **GRANTED** in part and **DENIED** in part; and

2. The motion of defendants, Judy L. McKain and Robert McKain, shall be and hereby is **GRANTED**; and

3. The motion of defendant Nancy Weidinger shall be and hereby is **GRANTED**; and

4. The motion of Allstate Insurance Company shall be and hereby is **GRANTED**; and

5. The motion of Aetna Casualty & Surety Company shall be and hereby is **DENIED**; and, more particularly,

A declaratory judgment is hereby entered in this action declaring that, for purposes of any tort claims arising out of the automobile accident involving defendant Jefferson Duncan that occurred on February 27, 1989:

1. Defendant Jefferson Duncan is entitled to $10,000,000 in liability insurance coverage under the Continental Insurance Company policy at issue in this action.

2. Defendant Jefferson Duncan is entitled to $1,000,000 in liability insurance coverage under the Aetna Casualty & Surety Company policy at issue in this action.

3. Defendant Jefferson Duncan is entitled to no liability insurance coverage under the Allstate Insurance Company policy at issue in this action.

4. Continental Insurance Company and Aetna Casualty & Surety Company have a concurrent duty to defend Jefferson Duncan in the underlying suits.

5. Continental Insurance Company and Aetna Casualty & Surety Company are concurrent insurers of Jefferson Duncan, their policies are "other insurance" to each other, and neither is excess to the other.