**NORTHBROOK INSURANCE COMPANY**

v.

**KULJIAN CORPORATION, Appellant.**

No. 82–1141.

United States Court of Appeals, Third Circuit.

Argued Sept. 14, 1982.

Decided Oct. 15, 1982.

 

Leonard Dubin (argued), C. Gary Wyncoop, George H. Kalikman, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellant.

Ralph B. Powell, Jr. (argued), Steven D. Johnson, Richard F. Wells, Philadelphia, Pa., for appellee.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

After a bench trial in a diversity action, the district court entered judgment requir-

ing defendant, one of two "named insureds" on a professional liability insurance policy, to pay the deductible amount notwithstanding that it was the other "named insured" which had incurred the underlying liability. The district court rejected the defendant's contention that the policy was ambiguous. We affirm.

### I.

H. A. Kuljian & Company and The Kuljian Corporation are concededly separate entities, both having been founded by Harry A. Kuljian. In 1934, Harry A. Kuljian, a professional engineer, began business as a sole proprietor under the name H. A. Kuljian & Co. performing consulting engineering services. That business was incorporated in 1941 as H. A. Kuljian & Company, Inc., expanding into the field of contracting and construction. In 1944, Harry A. Kuljian and James Cherry, an architect, established an unincorporated business under the name H. A. Kuljian & Company to perform engineering and architecture services. To avoid confusion, the name of the corporation was changed in 1946 to The Kuljian Corporation. Thus, at the times relevant for this lawsuit, The Kuljian Corporation's principal business was construction; H. A. Kuljian & Company's business was architecture and engineering. Harry A. Kuljian died in 1974; Cherry had retired previously, and the company ceased to undertake any new business. It continued to exist and receive money for contracts entered into earlier.

The Northbrook Insurance Company issued a professional liability insurance policy, on or about September 12, 1975, to H. A. Kuljian & Company and The Kuljian Corporation.[1] The policy provided that North-

---

**1.** The relevant parts of that policy are as follows:

Northbrook Insurance Company (hereinafter called the Company) agrees with the Named Insured, in consideration of the payment of the premium, the undertaking of the Insured to pay the deductible as described herein and in the amount shown in the Declarations, in reliance upon the statements in the application made a part hereof, and subject to the limits of liability shown in the Declarations, and subject to all the terms of this insurance as follows: ...

I. Coverage: Claims Made Provision. The Company will pay on behalf of the Insured all sums in excess of the deductible amount stated in the Declarations which the Insured shall become legally obligated to pay as damages by reason of any act, error or omission committed or alleged to have been committed by the Insured, or any person or organization for whom the Insured is legally liable provided always that:

brook made the agreement "in consideration of . . . the undertaking of the Insured to pay the deductible as described herein and in the amount shown in the Declarations"; that Northbrook agreed to pay "on behalf of the Insured all sums in excess of the deductible amount stated in the Declarations which the Insured shall become legally obligated to pay as damages . . ." provided that "[t]he Insured's legal liability arises out of the performance of professional services as described in the Declarations . . ."; that the deductible amount "shall include loss payments and claims expenses, whether or not loss payment is made"; and that the "Named Insured" will pay such part of the claims expenses as demanded but that "the total payments requested from the Named Insured in respect of each single claim shall not exceed the deductible amount . . ."

"Insured" is defined in the policy as follows:

II. Insured. The unqualified word "Insured" whenever used in this Policy shall mean the Named Insured so designated in the Declarations and any partner, director, officer or employe of the Named Insured while acting in the course of his duties conducted by him for and on behalf of the Named Insured solely in their professional capacity as described in the Declarations.

In applying for this policy, Edward Kuljian, as President of The Kuljian Corporation, had listed "The Kuljian Corporation; H. A. Kuljian & Company" under the heading "Name of applicant." As a result, the policy Declarations identified the Named Insured as "The Kuljian Corporation; H. A. Kuljian & Company." Likewise, the application specified the applicants to be architects, civil engineers, electrical engineers, mechanical engineers, structural engineers and environmental engineers without differentiating those lines of business engaged in by The Kuljian Corporation from those lines of business engaged in by H. A. Kuljian & Company. Consequently, the policy Declarations listed the "Named Insured's Professional Activity" as "Architecture; Civil; Structural, Mechanical, Electrical and Environmental Engineering."

The policy Declarations fixed the deductible amount at $25,000. The effective date of the policy was specified as September 5, 1975 to September 5, 1976.

In late 1975, shortly after the issuance of the Northbrook policy, H. A. Kuljian & Company was named as one of the defendants in two actions filed by the PENN–DELCO Union School District to recover damages arising from the allegedly negligent design and/or construction of the roof of a junior high school building. The claim against H. A. Kuljian & Company was based upon its alleged negligence in the preparation of the plans and specifications. Northbrook was responsible for the potential liability of H. A. Kuljian & Company by virtue of paragraph I of the policy, which specified coverage as extending to claims first made during the policy period. The Kuljian Corporation was named in one of the actions as an additional defendant by one of the original defendants but was never served.[2] Counsel stipulated at trial that

(a) Claim is first made against the Insured during the policy period by reason of such act, error or omission, and
(b) The Insured's legal liability arises out of the performance of professional services as described in the Declarations . . .
III. Limits of Liability. . . . The inclusion herein of more than one Insured or the making of claims or the bringing of suits by more than one person or organization, shall not operate to increase the limit of the Company's liability for each single claim and in the aggregate.
IV. Deductible. The deductible amount stated in the Declarations shall be applicable to each single claim and shall include loss payments

and claims expenses, whether or not loss payment is made.
It is agreed that the Named Insured, upon demand by the Company, will pay within ten days, such part of the claims expenses as written demand may be made, and in the event of any loss payment being required, the Named Insured shall make payment of such requested sum within ten days. However, either singly or combined, the total payments requested from the Named Insured in respect of each single claim shall not exceed the deductible amount shown in the Declarations.

2. On May 23, 1978, there was a docket entry in that action "Order filed & the case against The

The Kuljian Corporation had no contractual relationship with the School District and was in no way liable in the PENN–DELCO lawsuits. App. at 32a.

After the PENN–DELCO lawsuits were filed, George Mooradian, counsel for H. A. Kuljian & Company, informed Richard Traub, counsel for Northbrook, of the existence of the actions, and shortly thereafter was authorized by Traub to conduct the litigation on behalf of Northbrook, but was asked to confer with Traub before taking major decisions. At that time, Mooradian was also general counsel of The Kuljian Corporation and an executor of Harry A. Kuljian's estate.

On May 17, 1978, confirmed by letter of May 18, 1978, Mooradian informed Traub that the School District was willing to settle and that H. A. Kuljian & Company's share of that settlement would be around $25,000. Mooradian also informed Traub, for the first time, that H. A. Kuljian & Company sat in the estate of Harry A. Kuljian, that the estate was virtually insolvent, and that H. A. Kuljian & Company would be unable to pay the deductible amount of the policy with regard to any settlement. On May 18, 1978, Traub authorized Mooradian to settle for any sum up to $25,000. On the same day, Traub notified Edward Kuljian, the President of the Kuljian Corporation, of the potential settlement with a possible contribution of $25,000 on the part of H. A. Kuljian & Company, and made demand upon The Kuljian Corporation, as a Named Insured under the policy, to pay the $25,000 deductible amount.[3]

Settlement in the PENN–DELCO lawsuits was entered on October 3, 1978. As a part of this settlement, H. A. Kuljian & Company was obligated to pay $20,000. Northbrook paid this amount. As required by the policy, Northbrook also paid $12,153 to Mooradian covering attorney's fees and costs arising from the PENN–DELCO lawsuits and the settlement.

Northbrook then brought this action against The Kuljian Corporation seeking payment of the deductible amount. Following a full trial, the district court, sitting without a jury, found that "The policy of insurance is not ambiguous as to the obligations of the named insured"; that the named insured as defined in the policy is "the same named insured that is responsible for payment of the deductible"; and that "[b]oth the Kuljian Corporation and the H. A. Kuljian & Company accepting the policy as each did, accepted the terms which obligated the named insured, which was both to pay whatever deductible might be in order, following payment of a claim made pursuant to the policy by either." App. at 249–50a. Accordingly, the court entered judgment against The Kuljian Corporation for the deductible amount[4] plus interest from the date defendant refused the demand for payment.

## II.

◼ This court in previously applying Pennsylvania law, as we also must in this case, has held that the decision whether a written contract is ambiguous is one for the court to decide as a matter of law. *Mellon Bank, N. A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir. 1980); *Brokers Title Co. v. St. Paul Fire & Marine Insurance Co.,* 610 F.2d 1174, 1178 (3d Cir. 1979). Our review therefore is plenary.

◼ In determining that the contract was not ambiguous, the district court did not restrict itself to the "four corners" of the instrument. Instead, it followed the approach which we recommended in *Mellon Bank, N. A. v. Aetna Business Credit, Inc.,* 619 F.2d at 1011–12, 1012 n. 13, and gave the defendant the opportunity to put forth any "reasonable" alternative interpretation of the words in the contract. Thus, the decision in this case was made after a full

---

Kuljian Corp. is Discontinued & Ended with prejudice." App. at 208a.

**3.** The Kuljian Corporation was acquired by AMDC, Inc. on April 27, 1978.

**4.** Less $509.27 which The Kuljian Corporation had already paid towards the expenses of the PENN–DELCO litigation.

trial, not on a motion on the pleadings or on summary judgment. Significantly, defendant did not use the opportunity to put forth extrinsic evidence to show that the terms of the contract are susceptible of differing meanings. Nor did it introduce any evidence as to why it undertook to obtain a joint policy or regarding the circumstances and negotiations between the parties. Indeed, the only witness produced by defendant was one who was not familiar with the events leading to the purchase of the insurance policy in question.[5]

On this state of the record, The Kuljian Corporation makes essentially two arguments: that the policy's terms are ambiguous and therefore should be construed against Northbrook, and that under the correct construction of the policy only the insured on whose behalf the loss payments were made or the claim expenses were incurred would be required to pay the deductible. Both arguments require us to turn to the contract language itself.

■ In determining whether the policy is ambiguous, we are guided by several principles well established under Pennsylvania law. When a term in an insurance policy is ambiguous and the intention of the parties therefore cannot be discerned from the policy, the court may attempt to arrive at a construction that seems reasonable and in accord with the parties' apparent intention as revealed by extrinsic evidence of the purpose of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract. *Celley v. Mutual Benefit Health & Accident Association,* 229 Pa.Super. 475, 482–83, 324 A.2d 430, 434 (1974). Evidence of prior and contemporaneous negotiations and understandings between the parties is admissible to prove their interpretation. *Id.* at 483, 324 A.2d at 435. On the other hand, if the words of an insurance policy are clear and unambiguous, they are to be given their plain and ordinary meaning. *Eastern Associated Coal Corp. v. Aetna Casualty & Surety Co.,* 632 F.2d 1068, 1075 (3d Cir. 1980), *cert. denied,* 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 843 (1981). "A court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them." *St. Paul Fire & Marine Insurance Co. v. United States Fire Insurance Co.,* 655 F.2d 521, 524 (3d Cir. 1981); *see also Urian v. Scranton Life Insurance Co.,* 310 Pa. 144, 150–51, 165 A. 21, 22–23 (1933). "A provision of an insurance policy is ambiguous if reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning." *Celley v. Mutual Benefit Health & Accident Association,* 229 Pa.Super. at 481–82, 324 A.2d at 434.

■ The policy in question defines "insured" to mean the "Named Insured so designated in the Declarations." The Declarations designate both H. A. Kuljian &

---

**5.** Although there is some force in the dissent's suggestion that extrinsic evidence should be considered only when a contract is susceptible of more than one meaning, Dissenting op. at 375, our precedent in *Mellon Bank* interpreting Pennsylvania law is to the contrary. In that case, we approved use of extrinsic evidence to show that, under all the facts and circumstances, it would be irrational to give seemingly plain contract terms their apparent meaning. *Mellon Bank,* 619 F.2d at 1012 n.13. As we noted there,

many cases which hold words unambiguous do so only after an examination of circumstances and facts demonstrate [sic] that any variation of the words would be an impermissible rewriting of the contract. *See, e.g., United Refining Co. v. Jenkins,* [410 Pa. 126, 189 A.2d 574 (1963)]; *Merriam v. Cedarbrook Realty, Inc.,* [266 Pa.Super. 252, 259],

404 A.2d 398, 401–402 (1978); *Best v. Realty Management Corp.,* 174 Pa.Super. 326, 101 A.2d 438 (1953) . . . If no "reasonable" alternative meanings are put forth, then the writing will be enforced as the judge reads it on its "face." *See International Systems, Inc. v. Personnel Data Systems,* [274 Pa.Super. 500, 418 A.2d 518 (1980)].

The Pennsylvania cases do not deviate from the established principle that parties may not introduce parol evidence to vary the terms of the contract. Nonetheless, they permit "examination of external signs and objective indicia" to aid in a "rational interpretation of the parties' intent." *Mellon Bank,* 619 F.2d at 1013 n.13. Unlike the dissent, we see nothing in *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1271 (3d Cir. 1979), as inconsistent with the subsequent *Mellon Bank* opinion.

Company and The Kuljian Corporation as the Named Insured. The policy imposes on the Insured the obligation, upon demand, to pay the deductible amount. By definition, there are two businesses listed as Named Insured; therefore, each is responsible, under the unambiguous terms of the policy, to pay the deductible.[6]

Appellant argues that the obligation of the Insured to pay the deductible must be read to mean the insured against whom there was a claim and on whose behalf the insurer afforded a defense.[7] Appellant argues that this construction follows from examination of the policy itself, a position it must maintain since it introduced no relevant extrinsic evidence. However, it points to no language in the policy under which the obligation of one of the Named Insureds to pay the deductible is limited to the situation when there is a claim against that Named Insured, and we are not free to so rewrite the policy. A court "cannot rewrite the terms of the policy or give them a construction in conflict with the accepted and plain meaning of language used" in the policy. *Adelman v. State Farm Mutual Automobile Insurance Co.,* 255 Pa.Super. 116, 123, 386 A.2d 535, 538 (1978).

We receive some assistance in construction of this policy from the decision of the highest court of Pennsylvania in *Pennsylvania Manufacturers' Association Insurance Co. v. Aetna Casualty & Surety Insurance Co.,* 426 Pa. 453, 233 A.2d 548 (1967). At issue in that case was a standard automobile bodily injury liability policy containing a provision excluding application of the policy "to bodily injury ... of any employee of the insured." By the terms of the policy, "insured" was defined to include the named insured. An employee of the named insured brought suit against another company which was concededly covered as an insured under the policy's "omnibus clause." The Court declined to accept the reading suggested by defendant's excess insurance carrier that "insured" in the employee exclusion must be confined to mean the particular insured claiming coverage. The Court held that since, under the unambiguous language of the policy, the unqualified word "insured" included the named insured, an employee of the named insured fell within the employee exclusion provision, even though the employee's claim was not directed against the named insured.

Thus, Pennsylvania law dictates that we must interpret "insured" as the language dictates. The policy language at issue is not ambiguous. Construing it in its ordinary and usual meaning, it obligates the named insured to pay the deductible.

Even if we were free, in the face of the clear language, to consider appellant's equitable argument, we would reject it. It was the appellant, through its President, which applied for the insurance policy covering both entities. Northbrook performed its obligation to defend, and even paid the settlement contribution in the first instance to insure that settlement would be effected. Appellant has offered no equitable argument as to why it should not be held to the letter of its contract. As we stated in *Mellon Bank, N. A. v. Aetna Business Credit, Inc.,* "[a]bsent illegality, unconscionableness, fraud, duress or mistake the parties are bound by the terms of their contract." 619 F.2d at 1009 (footnote omitted).

We will affirm the judgment of the district court.

---

6. The mere fact that there is more than one Named Insured does not, ipso facto, make the policy ambiguous, since it is evident that the policy expressly contemplated that there could be more than one named insured. *See* paragraph III of the policy set forth in Note 1 *supra.*

7. Appellant argues that the policy required Northbrook to request approval of the Named Insured to any settlement and that Northbrook failed to request its approval. The record demonstrates, and the appellant does not deny, that before the settlement was effected, Northbrook sent appellant's President a letter which advised him of the settlement and requested payment of the deductible. Appellant neither objected to the settlement nor to its terms. We need not decide whether the written notice given satisfied Northbrook's obligation because appellant has not raised Northbrook's failure to comply with that policy term as a defense. Under those circumstances, Northbrook's failure to formally request appellant's approval does not enlighten our task of interpretation of the policy language.

## 374

GIBBONS, Circuit Judge, dissenting:

I would reverse the trial court's decision imposing on an insured, having no responsibility for the underlying liability, an obligation to pay on behalf of another insured which was so responsible the deductible amount of the liability coverage. I agree with the majority that the question whether an insurance contract is ambiguous is a question of law for the court, and on that issue our review is plenary. The majority's conclusion, however, that the policy in question is unambiguous is legal error. As written the policy may reasonably be interpreted in more than one way. That being so, the rule applicable to contracts generally would require a determination, as a matter of fact, of the actual intention of the parties. See Community College v. Community College, Society of the Faculty (PSEA/NEA), 473 Pa. 576, 592, 375 A.2d 1267, 1275 (1977). With insurance contracts, however, no such factual determination is required, because of the operation of the general rule of construction that ambiguities in a contract issued by a compensated risk underwriter are resolved in favor of the policyholder. See, e.g., Blocker v. Aetna Casualty & Surety Co., 232 Pa.Super. 111, 114, 332 A.2d 476, 478 (1975).

The policy, an insurance company printed form, adopts throughout the singular noun form in referring to the Insured. However, the use of a singular noun cannot be taken literally, because the insurer issued a policy, on its printed form, with two named insureds. The definition of Insured in Article III compounds the grammatical difficulty, because that definition makes a distinction between the named Insured (singular) and additional insureds (plural). There is, therefore, on the face of the policy a source of ambiguity. The definition of Insured refers to a singular Named Insured and to plural additional insureds, while the clause naming the policyholder lists two named insureds. The two named insureds are separate business entities, and despite the use of the singular "Named Insured" in the definition of Insured, it must have been intended that there be two separate classes of additional insureds. Each named insured

engaged in its own business, and the partners, directors, officers and employees of each exposed each named insured to separate risk incidents which might produce a claim. With that understanding in mind, I turn to the deductible clause, which reads:

The deductible amount stated in the Declarations shall be applicable to each single claim and shall include loss payments and claim expense, whether or not loss payment is made.

If there was only one named insured the deductible clause would undoubtedly be unambiguous. It would mean that for each claim against that named insured growing out of the activities of its partners, directors, officers and employees a separate deductible amount applied. But here there are two named insureds, while the deductible clause refers to "each single claim." Moreover, in the opening clause Northbrook Insurance Company "agrees with the Named Insured [singular], in consideration of the payment of the premium, the undertaking of the Insured [singular] to pay the deductible as described herein ..." to afford coverage.

The policy is subject to two distinct readings. The first reading, which to me is the far more plausible, is that despite the use of a single policy form the insurer has entered into distinct contractual undertakings with two distinct business entities. So read, the obligation to pay the deductible amount applies separately for each entity with respect to claims against it. The other reading, which the majority says is unambiguously compelled by the policy language, is that each separate entity undertook to be a cross guarantor of the obligation of the other to pay the deductible amount applicable to claims against the other. Not only do I disagree that such an undertaking unambiguously appears on the face of the policy; I find it a highly implausible interpretation.

In order to bolster that implausible interpretation the majority, citing Mellon Bank, N. A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011–12, 1012 n.13 (3d Cir. 1980), asserts that in determining whether or not a written contract is ambiguous, the court

can go outside the four corners of the contract to determine the intention of the parties. *Mellon Bank* does not stand for such a proposition. It authorizes a court, in considering whether or not a contract is susceptible to two or more reasonable interpretations, to consider evidence as to custom and trade usage, not evidence as to all the facts and circumstances. Only when the court determines the legal question of whether an integrated written agreement is susceptible of more than one meaning is it appropriate to look at all the evidence to determine the factual question of the actual intention of the parties. *Mellon Bank, N. A. v. Aetna Business Credit, Inc.*, 619 F.2d at 1011. To read *Mellon Bank* as does the majority would be inconsistent with our en banc decision in *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1271 (3d Cir. 1979), wherein we stated:

> Under Pennsylvania law, the intent of the contracting parties is exclusively determined from the written instrument if its words are "clear and unambiguous." *Id.* [*Kennedy v. Erkman*, 389 Pa. 651, 655, 133 A.2d 550, 552 (1957)]; see *East Crossroads Center, Inc. v. Mellon-Stuart Co.*, 416 Pa. 229, 205 A.2d 865 (1965); *United Refining Co. v. Jenkins*, 410 Pa. 126, 189 A.2d 574 (1963). However, when the language of the written contract is ambiguous, extrinsic or parol evidence is admissible to resolve the ambiguity. *In re Herr's Estate*, 400 Pa. 90, 94, 161 A.2d 32, 34 (1960); *Kennedy v. Erkman, supra; Castellucci v. Columbia Gas, Inc.*, 226 Pa. Super. 288, 292, 310 A.2d 331, 333 (1973). Although the interpretation of a written contract that is clear and unambiguous is for the court, *Pines Plaza Bowling, Inc. v. Rossview, Inc.*, 394 Pa. 124, 145 A.2d 672, 676 (1958), once the court determines that parol evidence is pertinent to the construction of an ambiguous contract; [sic] it is for the jury to resolve the ambiguities and find the parties' intent. *Easton v. Washington County Insurance Co.*, 391 Pa. 28, 35–36, 137 A.2d 332, 336 (1957); *Castellucci v. Columbia Gas, Inc., supra* 226 Pa.Super. at 294, 310 A.2d at 334.

(footnote omitted). The majority also complains that "defendant did not use the opportunity to put forth extrinsic evidence to show that the terms of the contract are susceptible of differing meanings." Maj. op., 371–372. Here, again, the majority is confusing the distinction between the legal issue of ambiguity on the face of an integrated written agreement and the factual issue of the intention of the parties if such ambiguity appears. The defendant was not required to submit such evidence because in deciding the initial question of ambiguity, except for evidence of custom or trade usage, resort to it would be improper. The majority argues further that the defendant failed "to introduce any evidence as to why it undertook to obtain a joint policy or regarding the circumstances and negotiations between the parties." Maj. op., 372. The policyholder, however, was the defendant in the action. Faced with a claim on an ambiguous contract, it had no obligation to introduce any evidence. If there was an ambiguity, the party relying on the written agreement had the burden of establishing the intention of the parties. Moreover, a compensated risk underwriter attempting to carry that burden would have to overcome the legal rule that in an insurance contract ambiguities are resolved in favor of the policyholder.

The majority reasons further that "[b]y definition, there are two businesses listed as Named Insured; therefore, each is responsible, under the unambiguous terms of the policy, to pay the deductible." Maj. op., 373. This is no more than an ipse dixit, assuming the very point in issue. Obviously each named insured is unambiguously required to pay *some* deductible. The question is, whose deductible, and the ambiguity is not eliminated by references to "the deductible" when several were contemplated. We can agree that "[a] provision of an insurance policy is ambiguous if reasonably intelligent men considering it in the context of the entire policy would honestly differ as to its meaning." *Celley v. Mutual Benefit Health & Accident Association*, 229 Pa.Super. 475, 481–82, 324 A.2d 430, 434 (1974). Perhaps I do not qualify as reasonably intelligent; certainly I do differ as to what the policy means. The very fact that the majority must rely on extrinsic evidence, including

the application, to support its "unambiguous" reading lends support to my conclusion that at least there is an ambiguity.

The majority's reliance on *Pennsylvania Manufacturers' Association Insurance Co. v. Aetna Casualty & Surety Insurance Co.*, 426 Pa. 453, 233 A.2d 548 (1967), is also misplaced. That case involved a dispute over coverage of additional insureds, not named insureds. It tells us nothing about the proper interpretation of an obligation to pay a deductible, for only the Named Insured, not the additional insureds, has such an obligation.

Since the trial court initially determined that the contract was unambiguous, it made no finding with respect to the intention of the parties. Instead, it held that the contract unambiguously made each separate Named Insured a guarantor of the deductible obligation of the other. That holding is an error of law. On the present record I would reverse, for there is no evidence which would overcome the rule of construction that ambiguous insurance contracts are construed against the insurance company which issued them.