

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-27-2002

# Westport Ins Corp v. Baker

Precedential or Non-Precedential:

Docket 01-1150

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Westport Ins Corp v. Baker" (2002). *2002 Decisions.* Paper 219.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/219

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed March 27, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1150

WESTPORT INSURANCE CORPORATION,
a Missouri corporation

v.

*RONALD JAY BAYER; EVELYN LAKEN; **ALAN LAKEN,
all Pennsylvania residents, as a party in his own right
and as Executor of the Estate of Morton Laken

Westport Insurance Corporation,

        Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 00-cv-00811)
District Judge: Honorable John P. Fullam

Argued: January 16, 2002

BEFORE: SCIRICA, GREENBERG, and BRIGHT,***
Circuit Judges

(Filed: March 27, 2002)

_____

        * (Amended in accordance with Clerk's Order dated 8/7/01.)

        ** (Amended - See Clerk's Order dated 10/1/01.)

        *** Honorable Myron H. Bright, Senior Judge of the United States Court
        of Appeals for the Eighth Circuit, sitting by designation.


        Brian C. Bendig, Esq. (Argued) and
         Jeffrey A. Goldwater, Esq.
        Bollinger, Ruberry & Garvey
        500 W. Madison St., Ste. 2300
        Chicago, IL 60661-2511
        Counsel for Appellant

        James J. West, Esq. (Argued)
        105 N. Front St.
        Harrisburg, PA 17101
        Counsel for Appellees

OPINION OF THE COURT

BRIGHT, Circuit Judge.

This dispute concerns the coverage afforded appellee, Ronald Jay Bayer, under the lawyer's professional liability insurance policy issued to him by Westport Insurance Corporation (Westport). In 1997, Morton Laken, Evelyn Laken and Alan Laken (the Lakens) sued Bayer, alleging fraud and misrepresentation, among other things. Westport subsequently brought this action against Bayer and the Lakens seeking a declaratory judgment that Westport was not obliged to pay any judgment rendered against Bayer in the Lakens' action. In the underlying suit, Morton Laken, Evelyn Laken, and Alan Laken v. Fryer Group of Cos., et al., No. 97-4413 (E.D. Pa. Nov. 17, 2000) [hereinafter Lakens v. Fryer Group], the district court found for the Lakens on their negligent misrepresentation claims against Bayer and entered judgment for over $678,000.[1] The district court then entered judgment in the instant case. The court declared Westport liable to the extent of the policy limits for payment of the Lakens' judgment against Bayer. The court determined that the policy's aggregate claims limit of

---

1. Bayer has appealed the district court's judgment in the underlying case to this court. We affirm the district court's judgment in an unpublished opinion that we file contemporaneously with this opinion. See Laken v. Fryer Group of Cos., No. 00-4302 (3d Cir. Mar. 27, 2002).

2

$500,000, rather than the single claim limit of $250,000, applied to this case.

On appeal, Westport argues that the district court erred in concluding that Bayer's Westport policy covers the Lakens' claims. Westport also argues that the district court improperly addressed the question of the amount of coverage provided by the policy, and erred in determining that amount. We affirm the district court's judgment that Bayer's Westport policy covers the Lakens' claims to the extent of the applicable policy limit. However, we vacate the district court's determination as to the dollar amount of coverage and remand to the district court for further consideration.

I. Introduction

A. The Underlying Case, Lakens v. Fryer Group

In July 1997, the Lakens filed suit against attorney Ronald Bayer and several other defendants to recover money lost in a Ponzi-type confidence scheme, in which the perpetrators of the fraud paid interest to early investors using money received from later investors.[2] In February 2000, Westport filed the instant declaratory judgment action. After some initial confusion resulting from Westport's failure to note that its declaratory judgment action was related to the Lakens' suit against Bayer, both cases proceeded separately before the same district court judge. In September 2000, after the conclusion of the

nonjury trial in Lakens v. Fryer Group, but before the district court issued its decision, the court ordered that Westport's declaratory judgment action would be determined on the basis of the record in Lakens v. Fryer Group.3 A brief recitation of the factual background of that underlying case is therefore a necessary part of our opinion here.

---

2. The district court found that Bayer was not criminally involved in the fraudulent scheme.

3. The order provided that Westport counsel receive a transcript of the trial testimony in Lakens v. Fryer Group and that Westport have ten days to request leave to produce additional testimony. Westport made no such request.

In November 1990, Leonard Brown, a friend and sometime client of Bayer's, invested $500,000 with Keith Fryer, who claimed to run a secondary mortgage business in England. Fryer gave Brown a ten-year promissory note bearing twenty-seven percent interest. Fryer told Brown that the very high second-mortgage financing rates in England allowed him to pay investors high rates of interest. Fryer did not, in fact, run a mortgage business. Rather, he used some of Brown's money to make the interest payments to Brown and kept the rest for himself.

Brown was pleased with the payments he received on his investment and proposed to Fryer that Brown bring in other investors in return for a commission. Brown recruited another "finder" and retained Bayer as his attorney to negotiate a commission arrangement with Fryer. Bayer negotiated an agreement that paid the finders a five percent commission each year on the additional money invested with Fryer as a result of the finders' activities. Bayer received one-third of the commissions. Bayer himself invested heavily with Fryer.

For the next several years Fryer maintained the pretense that he ran a real mortgage business. Brown hosted gatherings to which he invited prospective investors and at which Fryer would present his nonexistent business as an investment opportunity. Bayer attended these gatherings, sometimes introduced Fryer, and generally promoted the investment.

Morton and Alan Laken, father and son, attended such a gathering. They each purchased installment notes issued by one of Fryer's dummy corporations, Park Securities, Ltd. They made their initial investments at Bayer's law office. Together they purchased a total of $678,009.59 worth of installment notes.4

Fryer's confidence scheme lasted until 1996, when some new investors insisted on an independent audit of Fryer's accounts. This audit exposed Fryer's fraud.

4. Morton Laken purchased installment notes totaling $425,540.84. These notes were made out variously to Morton Laken, to Morton and Evelyn Laken (his wife), and to Morton Laken in trust for a third party. Alan Laken purchased installment notes totaling $252,468.75.

The Lakens sued Bayer, the Fryer Group of Companies, and several other defendants for misrepresentation and fraud, among other things. Over time the Lakens learned that all defendants except Bayer were fictitious, bankrupt, or otherwise judgment proof. Bayer himself filed for bankruptcy before the Lakens' action against him reached trial. The bankruptcy filing automatically stayed the trial in the Lakens' suit against Bayer. The Lakens eventually obtained an order lifting the stay when they agreed to limit any damages they might receive to those available under Bayer's professional liability insurance policy with Westport. Westport then filed this action seeking a declaratory judgment that Bayer's Westport policy provides no coverage for the Lakens' claims against Bayer.

The Lakens' suit against Bayer finally came to trial before the district court on September 11, 2000. On November 16, 2000, the court issued its decision. The court found for the Lakens and against Bayer on the Lakens' negligent misrepresentation claims and entered judgment in the Lakens' favor for $678,009.59.

In its decision, the district court found the following facts regarding Bayer's actions and his relationship to the Lakens. Bayer was Fryer's point of contact in America. Bayer introduced Fryer to potential investors at investment presentations. Bayer enthusiastically endorsed the investment opportunity offered by Fryer. He received funds from American investors and forwarded them to Fryer in England. Bayer received one-third of the finders' commissions on investments they solicited. He was authorized to draw checks on Fryer's American business account in emergencies. At one point, Bayer suggested that arrangements be made to give investors greater security in their loans, such as blanket debentures covering all assets of the Fryer Companies, but the idea was dropped when Fryer said that any such arrangement would require a reduction in the interest rates paid to the investors.

The court also found that the Lakens never retained Bayer to act as their attorney, but Bayer (a longtime attorney of the Lakens' friend, Brown) created the impression that he was "looking out for" the Lakens' interests. He permitted the Lakens to believe that he had

"checked out" Fryer's activities and claimed to have performed a "due diligence" investigation. He let it be

known that he had gone to England as part of the investigation. The Lakens relied on the information they received from Bayer.

The trial court concluded that these facts provided a basis for Bayer's liability:

> In my view, the circumstances give rise to the legal obligation on the part of Mr. Bayer, either to make clear that he was not protecting plaintiffs' interests and that they should seek legal advice elsewhere, or to exercise reasonable care to avoid misrepresentations to them. Since he did neither, he is liable for their losses if their reliance upon his misrepresentations was reasonable.
>
> The issue of justifiable reliance is a close one, but I believe the balance tips in favor of the plaintiffs on that issue. Although they did no independent investigation of their own, they were led to believe, by persons they trusted, that the proposed investment had been thoroughly investigated by others more knowledgeable than themselves.

Lakens v. Fryer Group, slip op. at 9.

B. The Policy

Bayer is the named insured on his "Lawyers Professional Liability Insurance" policy with Mt. Airy Insurance Company, a predecessor to Westport. Mt. Airy issued the policy pursuant to Bayer's application. That application included a "Supplemental Practice Application" which directed Bayer to describe any financial planning or investment counseling that formed part of his practice. On this form, Bayer answered "no" to questions asking whether his practice involved "money management activities" or recommending investment in "specific securities." However, he described his activities regarding the Park Securities investments in an addendum he attached to his application:

> [K]indly be advised that Park Securities, Ltd., a mortgage company in Manchester, England, borrows

> money from individuals to be used in its mortgage portfolio. I prepare the Notes from the investors to Park Securities, Ltd. The distribution of the investment income was, for a period of time, in 1991, being wired to me, in bulk, and thereafter sent to the individual parties by my personal check. The current method of distribution [of investment income] is by wire to the mortgage company's bank i[n] Philadelphia with distribution being made by checks signed by the principal of the company. I do have deputy authority on the checking account for use in emergencies. I do not counsel the investors except to advise them to pay

income tax on the funds since the mortgage company does not send 1099's. I do receive compensation for my work in cabling the funds and preparing the documents in the form of an override.

App. at A-2-26.

The insuring agreement of the policy issued to Bayer declares that the policy provides coverage for claims against Bayer "arising out of services rendered or which should have been rendered by any insured . . . and arising out of the conduct of the insured's profession as a lawyer."

The policy contains two exclusions that are relevant to this lawsuit. Exclusion E states that the policy does not apply to "any claim arising out of any insured's activities as an officer, director, partner, manager or employee of any company, corporation, operation, organization or association other than [the] named insured." Exclusion G precludes claims "arising out of or in connection with the conduct of any business enterprise other than the named insured . . . which is owned by any insured or in which any insured is a partner, or which is directly or indirectly controlled, operated or managed by any insured either individually or in a fiduciary capacity."

C. Proceedings in Westport's Declaratory Judgment
    Action

In its declaratory judgment action, Westport asserted that the Lakens' claims arose from Mr. Bayer's activities in a business enterprise separate from his law practice, an enterprise in which he solicited investors and served as a

7

local representative for Fryer. Westport argued that the insuring agreement in the policy, or either of the exclusions mentioned above, precluded coverage for the Lakens' claims against Bayer.

Relying on the evidentiary record from the Lakens' suit against Bayer, the federal district court found the following facts relevant to Westport's action for declaratory judgment: (1) in all his contacts with the Lakens, Bayer considered himself to be practicing law as an attorney representing Fryer in the United States and receiving contingency fees based on the results he obtained for Fryer; (2) the Lakens regarded Bayer as engaged in performing legal services in his capacity as an attorney; (3) in all relevant activities, Bayer held himself out to the Lakens as a practicing attorney and realized that they dealt with him on that basis; and (4) Bayer was never an officer, director, partner, manager or employee of anyone other than himself.

Based upon these findings, the court concluded that, although there "probably was not an actual attorney client relationship" between Bayer and the Lakens, Bayer's policy covered the claims against him by the Lakens. The district

court also stated that the addendum to Bayer's application removed any doubt that Bayer's policy with Westport covered the Lakens' claims. "Having issued its policy pursuant to [Bayer's] application, Westport cannot now disclaim coverage for liabilities arising from the precise activities thus described." The court ordered Westport liable to pay the $678,009.59 judgment rendered against Bayer in Lakens v. Fryer Group "to the extent of policy limits," which in the body of the opinion it determined to be $500,000.5

II. Discussion

The district court sat as fact finder in this case. We review the court's findings for clear error. See Fed. R. Civ. P. 52(a). In their briefs to this court, both parties profess to

_____

5. The district court's order declares Westport liable for payment of the judgment rendered against Bayer in Lakens v. Fryer Group "to the extent of policy limits." In its opinion, however, the court states that the question before it is whether Westport must pay the judgment against Bayer "to the extent of the policy limit ($500,000)."

8

accept and rely upon the district court's findings of fact. We note, however, that in places their representations of those facts are quite different from one another and from those of the district court. We consider it important, therefore, to state clearly that our review of the record in this case, including the Lakens v. Fryer Group trial transcript, shows no clear error in the district court's findings of fact.

Interpretation of the insurance policy's coverage is a question of law and our review is plenary. Pacific Indem. Co. v. Linn, 766 F.2d 754, 760 (3d Cir. 1985). Pennsylvania law governs our interpretation of this insurance policy and the extent of its coverage. We read policies to avoid ambiguities, if possible. Northbrook Ins. Co. v. Kuljian Corp., 690 F.2d 368, 372 (3d Cir. 1982).

A. The Insuring Agreement

The insuring agreement states that the policy covers claims "arising out of services rendered or which should have been rendered by any insured . . . and arising out of the conduct of the insured's profession as a Lawyer." Westport argues that the Lakens' claims did not arise out of Bayer's conduct as a lawyer and, therefore, the policy does not cover Bayer's liability for those claims. 6

Citing a Ninth Circuit appellate decision, General Accident Ins. Co. v. Namesnik, 790 F.2d 1397 (9th Cir. 1986), and a federal district court case from North Carolina, H.M. Smith v. Travelers Indem. Co., 343 F. Supp. 605 (M.D.N.C. 1972), Westport contends that Bayer's policy covers only those claims that arise from acts or omissions unique to the practice of law. Westport argues that the

_____

6. Westport makes repeated reference to the fact that the Lakens were not in an attorney-client relationship with Bayer. We note that professional liability can arise out of an attorney's activities with those other than his own client. See Harad v. Aetna Cas. & Surety Co., 839 F.2d 979, 984 (3d Cir. 1988) (stating that the plain meaning of the term "professional service," does not of itself require an attorney-client relationship); Humphreys v. Niagara Fire Ins. Co., 590 A.2d 1267, 1270 n.9 (Pa. Super. Ct. 1991) (noting that policy language similar to that in the instant case "does not state that it will only cover claims brought by clients of the attorney or third party beneficiaries to the attorney-client relationship. . . . [or] that it will only cover claims for malpractice.")

district court's findings in Lakens v. Fryer Group demonstrate that Bayer's liability to the Lakens does not stem from "failure to do anything related to uniquely legal skill or training." Thus, according to Westport, Bayer's liability is not covered by the insuring agreement.

We reject this argument. We note, as an initial matter, that neither Namesnik nor H.M. Smith applies Pennsylvania law. In addition, Namesnik does not stand for the proposition that a lawyer's professional liability insurance policy covers only claims arising from acts unique to the practice of law. H.M. Smith better supports Westport's argument, but we ultimately find it unpersuasive.

In Namesnik, an attorney had recommended to his clients that they invest in corporations which he formed, operated, and for which he performed legal work. At the same time, the attorney continued to perform legal services for the clients. He billed the clients for that legal work, but not for any work performed in the financial ventures. When the clients lost the money they had invested, they brought a legal malpractice claim against the attorney and the insurer sought a declaratory judgment of noncoverage. The district court granted summary judgment to the insurer and the Ninth Circuit Court of Appeals affirmed. The Ninth Circuit determined that "the lack of fees directly traceable to the [investments], at a time when fees were billed for legal services" supported the insurer's contention that the clients' claims against the attorney stemmed from his actions as a business agent rather than a lawyer. Namesnik, 790 F.2d at 1399. The court held that the clients' failure to respond directly to this evidence left no genuine issues of material fact, making summary judgment for the insurer appropriate.

Namesnik does not require that the Lakens' claims stem from an act by Bayer that required "uniquely legal skill or training." If Namesnik is applicable at all to the case before us, it merely requires that the Lakens present evidence that Bayer provided professional services from which the Lakens' claims arise. The facts found by the district court support the conclusion that the Lakens presented such evidence.

In H.M. Smith, a federal district court, citing a "helpful" New Jersey Supreme Court case, determined that an attorney did not act in a legal capacity when he solicited, and then invested, funds from a non-client. 343 F.Supp. at 609-610. The court based its decision, in part, on its determination that "the transaction itself is one that requires no legal skill or training." We conclude, however, that whatever persuasive authority that case provides is overcome by the following analysis which applies Pennsylvania law.

Bayer's policy does not define what it means for an injury to "aris[e] out of the conduct of the insured's profession as a lawyer." The Pennsylvania appellate courts have determined that "use of the undefined phrase 'professional services' may well give rise to a finding of ambiguity" in an insurance policy. Biborosch v. Transamerica Ins. Co., 603 A.2d 1050, 1056 (Pa. Super. Ct. 1992). Likewise, language in a professional liability policy stating that the insurer will cover all injuries "arising out of " the rendering or failure to render professional services, and will defend "any" suit against the insured seeking such damages, signals that the coverage is to be broadly construed. Danyo v. Argonaut Ins. Cos., 464 A.2d 501, 502 (Pa. Super. Ct. 1983). We therefore broadly construe the coverage afforded by the insuring agreement of Bayer's policy.

A policy provision is ambiguous if reasonably intelligent people would honestly differ as to its meaning when considering it in the context of the entire policy. Northbrook, 690 F.2d at 372. Under a broad construction of the coverage in Bayer's policy, reasonably intelligent people would differ as to whether the provision covering claims "arising out of services rendered or which should have been rendered . . . and arising out of the conduct of the insured's profession as a Lawyer" includes Bayer's actions in preparing installment notes, transferring money, and generally advising investment in Fryer's companies while holding himself out as an attorney who is watching over the Lakens' investments. See Home Ins. Co. v. Law Offices of Jonathan DeYoung, P.C., 32 F. Supp. 2d 219, 230 (E.D. Pa. 1998) (denying summary judgment to attorney's liability insurer and concluding that under Pennsylvania law,

"[b]ecause the term 'professional services' is undefined in the policy, it is possible for reasonable minds to reach varying conclusions" as to whether an attorney who had invested funds on client's behalf had rendered professional services). That policy provision is therefore ambiguous.

Where a policy provision is ambiguous, we construe the provision in favor of the insured in a manner consistent with the reasonable expectations insured had when obtaining coverage. Standard Venetian Blind Co. v.

American Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983); Danyo, 464 A.2d at 502. The addendum Bayer attached to his application for coverage indicates his reasonable expectation that his work concerning Park Securities, Ltd. would be covered. We therefore construe the policy's language in favor of coverage. We conclude that the policy's insuring agreement provides coverage to Bayer for the Lakens' claims against him.

B. The Exclusions

For Exclusion E of Bayer's policy to apply to this case, Bayer must have been an officer, director, partner, manager or employee of some entity other than his firm. The district court found that Bayer never served as an officer, director, partner, manager or employee of any entity other than his firm. Westport disputes this finding, but offers no direct evidence to the contrary. We have reviewed the record and conclude that the district court did not clearly err in finding that Bayer never held any such position. Our acceptance of that finding precludes application of Exclusion E to the facts of this case.

That same finding by the district court makes inapplicable the terms in Exclusion G regarding ownership, partnership, and management. As a result, in order for Exclusion G to apply to this case, the Lakens' claims must "aris[e] out of or in connection with the conduct of any business enterprise other than the named insured . .. which is directly or indirectly controlled [or] operated . . . by any insured."

Westport cites Coregis Ins. Co. v. LaRocca, 80 F. Supp. 2d 452 (E.D. Pa. 1999), and Coregis Ins. Co. v. Bartos, Broughal & Devito, LLP, 37 F. Supp. 2d 391 (E.D. Pa.

12

1999), which address policies containing language similar to Exclusion G. These cases are distinguishable. In each of these cases, the insured attorney was a partner in a business enterprises other than his law practice. The opinions in these cases focus on the meaning of the terms "arise out of " and "in connection with." The applicability of Exclusion G in the case before us, in contrast, turns on whether Bayer exerted the influence suggested by the terms "operate" and "control."

The facts as found by the district court in Lakens v. Fryer Group indicate that Bayer's influence on Park Securities extended only to preparing the installment notes, passing investments and interest payments back and forth between the investors and Fryer, and possessing authority to use the entity's checking account in emergencies. He was, as the district court put it, a "point of contact." The district court implicitly rejected the view that this constituted control or operation of Park Securities, and we explicitly reject it now. We conclude that Bayer's activities, while professional services broadly construed, do not bespeak

control or operation of Park Securities.7  We hold that
Exclusion G in Bayer's policy does not apply to the
circumstances of this case.

C. Policy Limits

The district court determined that the Lakens' claims
against Bayer triggered the policy's $500,000 limit for
aggregate claims rather than the $250,000 single claim
limit. Westport contends that the issue of policy limits is
beyond the scope of the declaratory judgment action, and
urges us to vacate the district court's determination on that
issue. Westport further argues that, in any case, the
applicable policy limit is $250,000.

Westport's declaratory judgment complaint requests a
declaration of no coverage for the Lakens' claims"along

_____

7. "[C]overage clauses are interpreted broadly so as to afford the greatest
possible protection to the insured. Exceptions to an insurer's general
liability are accordingly to be interpreted narrowly against the insurer."
Eichelberger v. Warner, 434 A.2d 747, 750 (Pa. Super. Ct. 1981)
(citations omitted).

13

with such other and further relief in its favor and against
the defendants as is just and proper." Westport never
requested a declaration of the applicable limits of coverage.
Nor did the Lakens' answer to the declaratory judgment
request such a declaration. The Lakens made no
counterclaim; they simply listed affirmative defenses and
requested a dismissal of the declaratory judgment action.
The parties did not put the question of limits before the
district court. Westport argues that under these
circumstances, the district court improperly went beyond
the scope of the declaratory judgment action by deciding
the applicable limit of coverage under the policy.

The Lakens reply that the Declaratory Judgment Act
provides the district court with authority to grant further
relief based on a declaratory judgment: "Further necessary
or proper relief based on a declaratory judgment or decree
may be granted, after reasonable notice and hearing,
against any adverse party whose rights have been
determined by such judgment." 28 U.S.C. S 2202. However,
Westport correctly points out that in this case the district
court offered no notice and held no hearing after the
declaratory judgment before granting further relief to the
Lakens by determining the applicable policy limits.

Generally, the judgment in a suit for declaratory
judgment must be responsive to the pleadings and issues
presented. See St. Paul Fire & Marine Ins. Co. v. Lawson
Bros. Iron Works, 428 F.2d 929, 931 (10th Cir. 1970). A
judgment beyond the issues presented constitutes an
advisory opinion. Id. Our own research has failed to
uncover any United States Court of Appeals case affirming

a district court's grant of declaratory relief to a defendant beyond that requested in the pleadings, except where the defendant brought a counterclaim. See, e.g., Starter Corp. v. Converse, Inc., 170 F.3d 286, 298 (2d Cir. 1999) (noting that "[c]ourts have also entered injunctions against unsuccessful [declaratory judgment] plaintiffs because either the prevailing party requested such relief, which was granted after notice and hearing, or the defendant had initially sought injunctive relief in its counterclaims") (emphasis added) (citations omitted); Penthouse Int'l, Ltd. v. Barnes, 792 F.2d 943, 950 (9th Cir. 1986) (holding that the

district court abused its discretion in awarding to declaratory judgment defendant relief beyond the scope of the issues presented in the action).

Moreover, we note that even if we were to address the issue of the applicable limit of liability under the policy, we would need further findings of fact by the district court or greater development of the record before we could determine whether the Lakens present a single claim or multiple claims under the policy definitions. Under the heading "Multiple Insureds, Claims and Claimants," the policy states:

> The inclusion of more than one insured in any claim or the making of claims by more than one person or organization shall not operate to increase the limits of liability and deductible.

> Two or more claims arising out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim.

> All such claims whenever made shall be considered first made on the date on which the earliest claim arising out of such act, error, omission or personal injury was first made and all such claims are subject to the same limits of liability and deductible.

App. at A-2-12.

The policy defines a claim to be "a demand made upon any insured for damages."[8]

We observe that under the Declaratory Judgment Act the Lakens can request that the district court order further relief based on the declaratory judgment. See  28 U.S.C. S 2202. Assuming the Lakens undertake such action, the district court may resolve this issue after notice and hearing either on the present record or, at its option, by

---

8. For cases addressing similar issues regarding policies with similar language, see Gregory v. Home Ins. Co., 876 F.2d 602 (7th Cir. 1989); Continental Cas. Co. v. Brooks, 698 So.2d 763 (Ala. 1997); and Bay Cities

Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 855 P.2d 1263 (Cal. 1993).

15

hearing additional evidence. See Edward B. Marks Music Corp. v. Charles K. Harris Music Publ'g Co., 255 F.2d 518, 522 (2d Cir. 1958).

We determine that the district court erred by granting relief to the Lakens on an issue outside the scope of the relief requested by Westport and without the notice and hearing required by statute. We therefore vacate the district court's determination that the applicable policy limit is $500,000.

III. Conclusion

We affirm the district court's judgment that Bayer's policy with Westport covers the Lakens' claims to the extent of the policy limits as may be determined at a later date. We vacate the district court's determination of the dollar amount of coverage and remand to the district court for further consideration.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

16